UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMILE CHREKY, | ) | |
| | ) | Civil Action No. 2:23-cv-00856-MRH |
| Plaintiff, | ) | |
| | ) | Judge Mark R. Hornak |
| v. | ) | |
| | ) | |
| UNIVERSITY OF PITTSBURGH PHYSICIANS, | ) | **ELECTRONIC FILING** |
| | ) | |
| | ) | |
| Defendant. | | |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Jennifer S. Park
Pa I.D. 87733 / Jennifer.park@dentons.com
Abigail Britton
Pa I.D. 333801 / abbie.britton@dentons.com

**DENTONS COHEN & GRIGSBY, P.C.**
625 Liberty Avenue
Pittsburgh, PA  15222-3152
(412) 297-4900 / Fax: (412) 209-1975

Counsel for Defendant,
University of Pittsburgh Physicians

## <u>TABLE OF CONTENTS</u>

**Page**

I.    SUMMARY OF ARGUMENT ...................................................................................1

II.    RELEVANT FACTUAL BACKGROUND.............................................................3
    A.    UPP .............................................................................................................3
    B.    Dr. Chreky's Annual Contract ...................................................................5
    C.    Dr. Chreky's 2020 Deficient Performance .................................................5

III.    LEGAL ARGUMENT.............................................................................................8
    A.    Dr. Chreky's Claims of Age Discrimination Under the ADEA And PHRA Must Be Dismissed. ....................................................................8
        (i)    No prima facie claim of age discrimination...................................8
        (ii)    UPP has stated legitimate, non-discriminatory reasons............................11
        (iii)    There is no evidence that UPP's decision was pretextual.........................11
    B.    Dr. Chreky Failed to Plead or Exhaust Administrative Remedies Regarding His Retaliation and Harassment Claims.............................20
        (i)    Failure to exhaust administrative remedies................................21
        (ii)    No facts supporting harassment or retaliation. ..........................21

IV.    CONCLUSION.......................................................................................................23

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMILE CHREKY, | ) | |
| | ) | Civil Action No. 2:23-cv-00856-MRH |
| Plaintiff, | ) | |
| | ) | Judge Mark R. Hornak |
| v. | ) | |
| | ) | |
| UNIVERSITY OF PITTSBURGH PHYSICIANS, | ) | **ELECTRONIC FILING** |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    SUMMARY OF ARGUMENT

This employment case arises out of Dr. Chreky's unsubstantiated allegations that UPP[1] unlawfully discriminated against him due to his age (b. 1950), when it did not renew his Annual Contract as an ER physician in the McKeesport ER.  Nothing could be further from the truth.

As an initial matter, Dr. Chreky has no right to renewal under his Annual Contract, which has a 12-month term, and UPP is not bound by any terms thereunder to support its nonrenewal decision.  Regardless, Dr. Chreky exhibited a pattern of well-documented behavioral and clinical performance concerns in 2020 to support UPP's decision not to renew his Annual Contract. Specifically, Dr. Chreky was involved in a number of incidents that showed, among other things, poor judgment and a lack of professionalism.  It is beyond dispute that the following events, which are set forth in Defendant's Statement of Undisputed Material DSOF ("**DSOF**"), point to (i) Dr. Chreky's inappropriate interactions with McKeesport ER staff that prompted a mandatory referral

---

[1] Unless otherwise defined herein, terms are defined in Defendant's Statement of Undisputed Material Facts (cited in this Memorandum as "**DSOF___**").

to the Physician Assistance Program, a.k.a., PAP Referral, and (ii) clinical deficiencies leading up to his Nonrenewal Notice, which was issued on March 5, 2021:

    (i)        September 2020 Confrontation with T.H.[2] (DSOF ¶¶ 27-47);

    (ii)      October 2020 Complaint about Dr. Chreky's Unavailability  (DSOF ¶¶ 48-51);

    (iii)     November 2020 Confrontation with C.R. (DSOF ¶¶ 52-75);

    (iv)     Wrong Medication Incident (December 8, 2020) (DSOF ¶¶ 83-90); and

    (v)      Worst Patient Chart Incident (December 10, 2020) (DSOF ¶¶ 91-98).

There was also feedback from McKeesport ER staff about Dr. Chreky's lack of availability responsiveness.   Based on Dr. Chreky's performance issues, UPP had legitimate, non-discriminatory reasons for the Non-Renewal of his Annual Contract.  UPP's decided not to renew Dr. Chreky's Annual Contract beyond its term ending June 30, 2021, and he received a Notice of Non-Renewal on or about March 5, 2021.  Dr. Chreky has not and cannot establish genuine issues of material fact that age played any role in UPP's nonrenewal decision.

There is no evidence that the September 2020 Confrontation with T.H. and November 2020 Confrontation with C.R., and UPP's response thereto, were motivated by discriminatory animus based on age, just as there is no evidence that J.S.'s October 2020 Complaint about Dr. Chreky's Unavailability (leaving J.S., a Physician Assistant, i.e., PA, alone with a STEMI patient), report of Dr. Chreky's administration of contraindicated medication to a patient, and report of Dr. Chreky's wholly deficient Patient Chart were due to unlawful discrimination.  Dr. Chreky never complained of age discrimination during his employment and, indeed, specifically told others that he believed

---

[2] The parties agreed to redact the Non-Party Subordinate Witness names pursuant to ECF Doc. 61. (ECF Doc. 62)

his Annual Contract was not renewed because of his November 2020 Confrontation with C.R. (DSOF ¶ 124)

Further, the notion that UPP would discriminate against Dr. Chreky due to his age flies in the face of reason where, as here, there is absolutely no evidence that:  (i) any decisionmaker was aware of or considered Dr. Chreky's age at the time the nonrenewal decision was made; (ii) there are several McKeesport ER physicians who are 60+ years old, (iii) no evidence that UPP hired younger physicians at McKeesport ER to replace Dr. Chreky or anyone else based on age . (DSOF ¶¶ 123-158)  Dr. Chreky's theory that Dr. Kumar, the former Department Chair, moreover, was forced out of her position so they could hire a younger replacement, Dr. Flaherty, is belied by the record and Dr. Kumar herself who testified that she informed Dr. Wadas in early 2020 of her intent to retire by the end of that year—Dr. Flaherty was not approached until months later about applying for the McKeesport Site Chief position.  (DSOF ¶¶ 136-144)

For the reasons set forth below in detail, Dr. Chreky has not and cannot demonstrate that his age was the "but for" reason for his Non-Renewal, as he must, and summary judgment should be granted in favor of UPP and against Dr. Chreky accordingly.

## II.    RELEVANT FACTUAL BACKGROUND[3]

### A.    THE PARTIES

UPP is a Pennsylvania non-profit corporation that employs, among others, ER physicians to staff various health care facilities and hospitals such as UPMC McKeesport.  (DSOF ¶1)  While the ER can be stressful, it is physicians describe UPMC McKeesport ER as a collaborative environment and a very tight-knit group because of the circumstances under which they work.

---

[3]  Defendant filed a Statement of Undisputed Material DSOF ("**DSOF**") and Appendix of Record Materials with this Memorandum per W.D. Pa. L.R. 56.  For the Court's convenience, Defendant offers a summary of those facts *infra*.

(DSOF ¶ 42) Failure to work well together could cause the ER to "fall apart." (DSOF ¶ 59)  Dr. Donald Yealy is the Chair of Emergency Medicine for UPP as well as the CMO of the UPMC Health Services Division.  Dr. Yealy oversees the physicians and advanced practice providers who report through the clinical department of UPP Emergency Medicine. (DSOF ¶2)  Until mid-2023, Dr. Richard Wadas served as the Executive Vice Chair of Community Emergency Medicine, overseeing ER operations at various community hospitals including UPMC McKeesport.  (DSOF ¶¶ 3-5)  Dr. Marek Radomski served as the Vice Chair for Community Emergency Medicine. (DSOF ¶ 6) Heather Reading serves UPP as a Senior HR Director (DSOF ¶ 7)  Since January 1, 2021, Dr. Sarah Flaherty has served as the McKeesport ER Site Chief (DSOF ¶ 8)  Prior thereto, Dr. Rani Kumar served as the ER Site Chief.  (DSOF ¶ 9) The ER Site Chief's responsibilities include, among other things, handling administrative duties, quality assurance, schedules, and performance of emergency room physicians under her supervision. (DSOF ¶ 10)

Dr. Chreky was born in 1950. (DSOF ¶ 11) He has a PA medical license and is board certified in internal medicine. (DSOF ¶ 13) UPP employed Dr. Chreky as an emergency physician at UPMC McKeesport pursuant to the written terms and conditions of an annual contract (the **"Annual Contract"**).  (DSOF ¶¶13-18 )  The initial term of his Annual Contract began on July 1, 2017 and ended June 30, 2018.  (DSOF ¶ 16)  Section 8.1 of the Annual Contract provides:

> Term. The initial period covered by this Agreement is one (1) year from the Effective Date…Each twelve (12) month period beginning on the Effective Date, and each twelve-month period thereafter which begins with each anniversary date of the Effective Date, will be referred to as a "Contract Year."  ***This Agreement will automatically renew for successive one-year periods unless otherwise agreed upon or unless a written notice of non-renewal is provided to Physician, on or before 105-days[4] prior to the termination date of the Agreement***.
> (DSOF ¶ 17) (emphasis supplied)

---

[4] Based on the July 1st start date, the Non-Renewal would be due on March 17, 2018.

The Annual Contract sets forth no rights or obligations of the parties with respect to renewal. (DSOF ¶ 18) Dr. Chreky's Annual Contract was renewed from 2018-2020. (DSOF ¶ 19)

Section 2.1 set forth Dr. Chreky's clinical duties including, but not limited to, the following:

> [S]ervices in the specialty of Emergency Medicine, ambulatory care services, providing on-call coverage, caring for hospital patients, participating in quality improvement, utilization review, making inventions related to the health care field or the Physician's other duties, and/or such other duties assigned from time to time within the Department Chair's sound judgment. (DSOF ¶15)

Under the Annual Contract, Dr. Chreky was subject to the policies established by UPP, UPMC Health Services Division, and the Department Chair, which includes the Professional Conduct Policy and Anti-Retaliation Policy. (DSOF ¶¶23-25 ) Dr. Chreky's Annual Contract was renewed successively for the years 2018-2020. (DSOF ¶19) On or about March 5, 2021, Dr. Chreky received a Nonrenewal Notice. (DSOF ¶20) Dr. Chreky's last day of employment was on June 30, 2021, and he was approximately 71 years of age. (DSOF ¶¶21-22)

**B.    DR. CHREKY'S 2020 DEFICIENT PERFORMANCE**

Based on her reviews and annual evaluations of Dr. Chreky, Dr. Kumar believed he did a good job when she was there except in 2020, when there were some concerns about his interactions with staff, in-patient team, and quality concerns with patients. (DSOF ¶20)

1.    **Unavailability**

On or about July 26, 2020, Dr. Kumar sent Dr. Chreky an email notifying him , in pertinent part, that she had "heard complaints from your colleagues that your are leaving 45 minutes before

your shift ends.  Your team complains that most of the days you are ready to check out early."[5] (DSOF ¶27) On or about October 21, 2020, Dr. Wadas received a report from PA, J.S., complaining that Dr. Chreky had left 45 minutes early, leaving him alone in the emergency room with a STEMI patient, i.e., heart attack patient, which a PA would not be expected to take care of alone.  (DSOF ¶¶ 49-50) J.S. also complained that Dr. Chreky leaves McKeesport ER for a period of time and avoids seeing patients and simply will not see GYN complaints. (DSOF ¶50)

### 2.    **Losing His Temper at APPs**

Two APPs,[6] T.H. and C.R., submitted complaints about Dr. Chreky's confrontational behavior toward them, which UPP investigated and found to have merit.  (DSOF ¶¶27-69) In the September 2020 Confrontation with T.H., it was determined, among other things, that Dr. Chreky loudly voiced his displeasure, directed toward T.H., because T.H. called Dr. Kumar about Dr. Chreky's absence in the ER, and, shortly thereafter,  Dr. Chreky accused T.H. of leaving his shifts early on two occasions, which was investigated and determined not to be true.  (DSOF ¶¶27-47) Dr. Chreky told Dr. Wadas that he reported the Time Theft Claim because T.H. reported him first. (DSOF ¶¶ 42)   In the November 2020 Confrontation with C.R., upon investigation, it was determined that Dr. Chreky used harsh language and was inappropriate in his interaction with C.R. following C.R.'s request that Dr. Chreky contact an ER patient's treating neurosurgeon before admitting the patient.  (DSOF ¶¶53-69) There is no evidence that Dr. Chreky expressly denied saying, "you're not gonna tell me what to do fucker," which is what C.R. reported (*Id.*) According to Dr. Kumar and Heather Reading, Dr. Chreky indicated he might have used the f-word.  On or

---

[5] In his 2019 Performance Review, Dr. Chreky was expressly told by Dr. Kumar that, "[a]ccessibility to staff and APP's is vital in the ED.  Carrying a charged phone (spectra link) and letting the staff know of his work location was discussed."  (DSOF ¶51)

[6] APPs include Physician Assistants ("PAs"), Nurse Practitioners ("NPs"), and Hospitalists.

about December 1, 2020, Dr. Chreky was directed to contact PAP to set up a meeting based on what was referred to as Dr. Chreky's "inappropriate behavior." (DSOF ¶¶ 70-75) Continued employment was not guaranteed based on his participation in PAP. (DSOF ¶¶ 72-75) The PAP clinical assessment reflected he was referred on a mandatory basis for swearing and speaking in a loud tone of voice with one of the PAs, and that "[h]e is aware that his behavior was not optimal and would do it differently if he had it to do again." (DSOF ¶73)

### 3.  <u>2020 Performance Review</u>

On December 8, 2020, Dr. Kumar delivered Dr. Chreky's 2020 Performance Review. (DSOF ¶¶76-82) The 2020 Performance Review reflected a "Requires Improvement" rating, noting, among other things:

> This year has been however challenging for Dr. Chreky. He has had confrontation with the APP and with the inpatient team requiring administrative intervention and HR involvement. Opportunity to enhance his communicative skills and his relationship with colleagues aligned with UPMC values was discussed with him and he is eager to work on it in the coming year.
> (DSOF ¶ 81)

### 4.  <u>Post-Review Clinical Issues</u>

In December 2020, after, his 2020 Performance Review, it came to Dr. Wadas's attention that Dr. Chreky was involved in the following clinical incidents:

i.  ***The Wrong Medication Incident***.  On or about December 10, 2020, Dr. Chreky exercised poor clinical judgment when he admittedly gave a Bradycardia (slow heart rate) patient a contraindicated drug that further slowed the patient's heart rate, thereby compromising patient safety.  (DSOF ¶¶83-90)

ii.  ***The Worst Patient Chart Incident***. On or about December 19, 2020, Dr. Wadas received a chart from a quality reviewer that Dr. Chreky had completed and submitted as final.  Dr. indicated it was probably one of the worst charts that he had ever seen as it contained "nothing that could help me understand what happened to the patient." (DSOF ¶¶91-98)

### C.    <u>NONRENEWAL</u>

On or about March 5, 2021, UPP issued a Nonrenewal Notice to Dr. Chreky.  (DSOF ¶¶91-122) Dr. Chreky's last day of employment with UPP was June 30, 2021.  (DSOF ¶15) According to Dr. Wadas, the salient reasons for nonrenewal were the September 2020 Confrontation with T.H.; October Complaint about Dr. Chreky's Unavailability; November 2020 Confrontation with C.R.; Wrong Medication Incident; and Worst Patient Chart Incident.  (DSOF ¶118-121) Unofficial feedback in the Fall of 2020 was also a factor.  (DSOF ¶122)[7]

Dr. Wadas concluded that Non-Renewal was appropriate for Dr. Chreky because the "last couple of events in 2020 and the conversations that…surrounded those events…raised (…) significant concerns."  As such, Dr. Wadas determined that "this [was] not going to be a salvageable relationship."  (DSOF ¶106) Dr. Donald Yealy, reviewed Dr. Chreky's employment, consulted Dr. Wadas, and, together, agreed to the nonrenewal decision.  (DSOF ¶117)

### III.    LEGAL ARGUMENT

### A.    <u>Dr. Chreky's Claims of Age Discrimination Under the ADEA And PHRA Must Be Dismissed.</u>

(i)    <u>No prima facie claim of age discrimination.</u>

To establish a prima facie case[8] of discrimination, Dr. Chreky must present sufficient evidence that: "The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff

---

[7] In January of 2021, when Dr. Flaherty started as ER Site Chief at McKeesport ER, she frequently received reports about Dr. Chreky's unavailability and discussed it with Dr. Wadas.  (DSOF ¶¶107-113)
[8] Dr. Chreky has not presented direct evidence of age discrimination. "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of the fact [in issue] without inference or presumption."  *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644 (E.D. Pa. 2018) (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (internal citations and quotations omitted).  Accordingly, Dr. Chreky must proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive."[9] In an age discrimination case, the Plaintiff must "show that age was the 'but for' cause of the adverse employment action—that age had 'a determinative influence on the outcome.'"[10] Under this heightened causation standard, it does not suffice to show that age played some role in an employer's decision.[11] PHRA claims are treated coextensively with ADEA claims.[12] Dr. Chreky is unable to establish a prima facie case of age discrimination. As an initial matter, Dr. Chreky was not terminated under the terms and conditions of his Annual Contract, for cause or otherwise – he was nonrenewed and he was not entitled to be renewed under any conditions. He could be nonrenewed for any or no reason. No adverse employment action occurred. (DSOF ¶¶16-18)

Second, although Dr. Chreky will attempt to argue that other physicians were hired to replace him based on age, there are no facts to support his theory. (DSOF ¶¶145-159) For example, Dr. Chreky has not and cannot establish facts to support that Dr. Paul Kim was hired to replace him because of his age. First, there were at least three McKeesport ER Physicians who were in their 60s from 2017-2022. (DSOF ¶¶129-131) Second, there were no discussions about removing physicians who had been at McKeesport ER for a period of time and bringing in new physicians or any other age-related comments that would raise the inference of discrimination. (DSOF ¶¶ 131-135, 146, 149) Indeed, Dr. Flaherty testified that a physician's age is seen in a somewhat positive manner insofar as the patient population is sometimes disrespectful to the younger

---

[9] *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015). *See also Laymon v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 454 (W.D. Pa. 2022) (Hornak, J.).

[10] *Kelly v. Moser*, 2009 WL 3236054, *2 (3d Cir. Oct. 9, 2009) (citing *Gross v. FBL Fin. Servs.*, 129 S. Ct. 2343, 2350 (2009)).

[11] *Id.* at *2-4.

[12] *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996).

physicians in that they feel the younger physicians don't know what they're talking about because they're too young.  (DSOF ¶134) Third, there's no evidence UPP posted or otherwise recruited Dr. Kim or anyone else to serve as a McKeesport ER Physician.[13]  Indeed, during the pandemic the need for ER physicians declined dramatically. (DSOF ¶ 146)

In the case of Dr. Kim, he reached out to UPP to express interest in staying with UPP post-residency – not the other way around.  (DSOF ¶148).  In addition to hospitals outside the UPMC network, Dr. Kim decided to look at three hospitals:  UPMC East, McKeesport, and Mon Valley, setting up site visits in November 2020—Dr. Radomski did not accompany Dr. Kim on any of these site visits – Dr. Kim visited alone.  (DSOF ¶150) Dr. Kim also did not work with any of the attendings at UPMC McKeesport when he was a resident.  (DSOF ¶150)  There is simply no evidence that Dr. Kim was being recruited for McKeesport ER.[14]

Further, Dr. Chreky has not and cannot demonstrate that Dr. Kim's duties, credentials, hours, and schedules sufficiently mirrored Dr. Chreky's.[15]  As a UPP physician, Dr. Kim actually split time between McKeesport (750 hours) and Mon Valley (750 hours), serving different communities, and by virtue of that split, would not have worked the same hours and schedule as Dr. Chreky before his nonrenewal.  (DSOF ¶149)  Unlike Dr. Chreky, whose contract was for

---

[13] *C.f. E.E.O.C. v. Marion Motel Assocs.*, 763 F. Supp. 1338, 1340 (W.D.N.C. 1991), *aff'd,* 961 F.2d 211 (4th Cir. 1992) (finding that plaintiff could identify purported replacement where employer placed an advertisement in the local paper announcing vacancies for plaintiff's position and urging "young, energetic persons" to apply, coupled with a manager's remarks to an older employee, "You can't teach an old dog new tricks.").

[14] *See Katz v. Beebe Healthcare*, No. 22-625-WCB, 2025 WL 1094406 (D. Del. Apr. 11, 2025) (determining that a physician was not "replaced" because the alleged "replacement" was hired for a different position and had actively inquired about the new role).

[15] *Lurie v. Mid-Atl. Permanente Med. Grp., P.C.*, 729 F. Supp. 2d 304, 318 (D.D.C. 2010) (determining younger surgeon was not replacement for plaintiff, finding, among other things, younger surgeon possessed qualifications that older surgeon lacked such as fellowship training and alleged connection between employer's offer of employment to younger surgeon and its decision to investigate older surgeon in connection with alleged disciplinary infractions was "terribly attenuated").

approximately 1800 hours, Dr. Kim's hours at McKeesport ER was a fraction of Dr. Chreky's contracted hours. (DSOF ¶¶14, 150)

The notion that Dr. Adkins or Dr. Flaherty are cognizable replacements under the law are even more unavailing. Dr. Flaherty was not in the same position – she was the ER Site Chief, serving as Dr. Chreky's superior. Dr. Adkins, moreover, was a Fellow in toxicology at McKeesport for a specific purpose and for a limited time. (DSOF ¶¶14, 150)

(ii)    UPP has stated legitimate, non-discriminatory reasons.

Even if Dr. Chreky could establish a prima facie case, which UPP denies, the record clearly establishes UPP's non-discriminatory business reasons for choosing not to renew Dr. Chreky's employment agreement. Dr. Chreky's performance significantly declined in 2020. As explained more fully in Sections I and II of this Memorandum, UPP made the decision not to renew Dr. Chreky's employment agreement after identifying a pattern of interpersonal and clinical issues occurring in 2020. *See also* DSOF ¶¶27-122 The nature and documentation of these incidents, along with Dr. Chreky's own admissions, would prevent a reasonable jury from concluding that UPP non-renewed Dr. Chreky because of his age. As UPP has met its light burden to state its legitimate, non-discriminatory reasons for its decision, the burden shifts to Dr. Chreky to show that UPP's reasons were pretextual, which he cannot do.

(iii)    There is no evidence that UPP's decision was pretextual.

1.    *Incontrovertible Behavioral and Clinical Issues Supporting Non-Renewal.*

Dr. Chreky's claim must be dismissed because he cannot create a genuine issue of fact that UPP's stated reasons are pretextual. To satisfy his burden, Dr. Chreky must point to record evidence that (1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication" or (2)

11

permits a "factfinder to infer that discrimination was more likely than not a … determinative cause[16] of the adverse employment action."[17]  It is not enough to "simply show that the employer's decision was wrong or mistaken."[18]  Rather, the plaintiff must rebut the employer's proffered reasons to allow a jury "reasonably to infer that *each* of the employer's proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[19]  Dr. Chreky, however, has not and cannot point to genuine issues of material fact that undermine the bases for his Non-Renewal.

(a)    <u>Confrontational Behavior Toward Staff</u>

Dr. Chreky alleges that one of the reasons UPP cited for his Non-Renewal, the so-called "Soup Incident" was a pretext for discrimination.  (Sec. Am. Compl. ¶¶ 12, 13, 15)  The "Soup Incident" reflects Dr. Chreky's version of the September 2020 Confrontation with T.H. on or about September 22, 2020.  (DSOF ¶¶ 27-47)  Dr. Chreky's tortuous explanation for why he was absent from the McKeesport ER misses the point.  T.H.'s Complaint was about Dr. Chreky's confrontational behavior directed towards him after learning T.H. contacted Dr. Kumar to report a problem in the ER and Dr. Chreky's subsequent unsubstantiated Time Theft Claim against T.H., was found meritorious following an investigation.  UPP determined Dr. Chreky's conduct demonstrated a violation of applicable policies governing professionalism and conduct (DSOF ¶¶

---

[16] The Third Circuit applies the "determinative cause" language of *Fuentes v. Perskie* in ADEA cases. However, this does not alter the Supreme Court's holding that plaintiff's burden is to prove that age was the but-for cause of the adverse action.  See Third Circuit Model Jury Instructions § 8.1.1, note 9.  *See also Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343 (2009) (holding that in all ADEA cases, the plaintiff retains the burden to prove that age discrimination was the but-for cause of the adverse employment action)

[17] *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).

[18] *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) ("the factual dispute at issue is whether the discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'").

[19] *Kautz,* 412 F.3d at 465 (emphasis in original) (citations omitted).

23-25) and amounted to clear retaliation against a subordinate. (DSOF ¶¶ 27-47) When Dr. Wadas asked Dr. Chreky he made a complaint to Dr. Kumar about T.H., Dr. Chreky testified, "he complained about me first." (DSOF ¶ 46) No reasonable jury could infer that T.H.'s Complaint, the ensuing investigation, and consequences was a post-hoc fabrication or not actually motivated UPP's employment action. Even if UPP's was wrong or mistaken in the conclusions it drew about T.H.'s Complaint, the issue is not whether UPP was prudent, wise, shrewd, or even competent, but whether UPP's actions were pretextually motivated by discriminatory animus based on age and Dr. Chreky has not and cannot identify any genuine issues of material fact that it was.

Similarly, Dr. Chreky cannot establish any genuine issues of material fact that UPP's actions with respect to the so-called "ER Incident," (Sec. Am. Compl. ¶¶ 12, 14, 15), which is Dr. Chreky's version of the November 2020 Confrontation with C.R., were motivated by discriminatory animus. The November 2020 Confrontation with C.R. occurred on November 18, 2020 – less than two months after the September 2020 Confrontation with T.H. (DSOF ¶¶ 52-75) UPP determined following an investigation that Dr. Chreky engaged in inappropriate behavior towards C.R. following an investigation, Dr. Chreky received a mandatory PAP referral, and his inappropriate conduct was referenced in his 2020 Performance Review. (Id.) Dr. Chreky simply has not and cannot identify any genuine issues of material fact to support that the proffered reason for any adverse employment action was motivated unlawful discriminatory animus based on his age. (DSOF ¶¶ 123-128)

(b)     October 2020 Complaint about Dr. Chreky's Unavailability

On or about October 21, 2020, Dr. Wadas received a report from PA, J.S., complaining that Dr. Chreky had left 45 minutes early, leaving him alone in the emergency room with a STEMI patient, i.e., heart attack patient, which a PA would not be expected to take care of alone. (DSOF ¶¶ 49-50) J.S. also complained that Dr. Chreky leaves McKeesport ER for a period of time and

avoids seeing patients and simply will not see GYN complaints. (DSOF ¶50) There are simply no facts to support that J.S.'s complaint about Dr. Chreky, Dr. Wadas's actions in relation thereto, or any other UPP action in relation to Dr. Wadas's actions were motivated by unlawful discriminatory animus based on Dr. Chreky's age. None. This was not the first complaint about Dr. Chreky's unavailability in 2020. Prior thereto, on or about July 26, 2020, Dr. Kumar sent Dr. Chreky an email notifying him, in pertinent part, that she had "heard complaints from your colleagues that you are leaving 45 minutes before your shift ends. Your team complains that most of the days you are ready to check out early."[20] (DSOF ¶27) Dr. Chreky's pattern of unavailability was known known to Dr. Flaherty, who began her employment as ER Site Chief on January 1, 2021. In the first few months as ER Site Chief, she was approached by an APP every shift that she worked at McKeesport ER about Dr. Chreky not being available to see patients. (DSOF ¶¶ 107-113) There is nothing in the record to suggest any complaints or reports about Dr. Chreky's unavailability were pretext for age discrimination.

(c)    Wrong Medication Incident[21]

On December 10, 2020, Dr. Wadas emailed Dr. Chreky to inquire why Dr. Chreky had administered Amiodarone to a patient presenting with bradycardia. (DSOF ¶ 83) Bradycardia is a condition that causes a slow heart rate. (*Id.*) Dr. Chreky administered Amiodarone, which causes the heart rate to slow down. (DSOF ¶¶84-85) Dr. Chreky admitted to Dr. Wadas that he had

---

[20] In his 2019 Performance Review, Dr. Chreky was expressly told by Dr. Kumar that, "[a]ccessibility to staff and APP's is vital in the ED. Carrying a charged phone (spectra link) and letting the staff know of his work location was discussed." (DSOF ¶51)

[21] Two days prior, on December 8, 2020, Dr. Kumar had met with Dr. Chreky to discuss his annual performance review for 2020. (DSOF ¶79) Because Dr. Kumar had already delivered Dr. Chreky's performance review for that year, Dr. Wadas and Dr. Radomski could not amend the review to include the amiodarone incident. However, Dr. Wadas requested that the email chain reflecting the amiodarone incident be appended to Dr. Chreky's 2020 performance review to reflect the subsequent medication error. DSOF ¶ 90)

misread the patient's strip.  (DSOF ¶86)  Dr. Wadas testified that he felt that Dr. Chreky failed to recognize the severity of the error.  (DSOF ¶87)  Specifically, Dr. Wadas testified that this incident, "potentially could've been very serious" and "in [his] clinical opinion, it was a big deal.  And in the opinion of the cardiologist that was involved with the case, it was a big deal."  (DSOF ¶88)  Dr. Wadas further testified that he felt Dr. Chreky's reaction to this incident demonstrated "no accountability" and caused frustration because "we're talking about the care of a patient."  (DSOF ¶89)  There is no evidence that the Wrong Medication Incident or any consequences therefrom were improperly motivated by age discrimination.  Where, as here, a physician admits to improper administration of a medication, courts have found that the physician failed to produce evidence that "casts sufficient doubt" upon the employer's proffered reason for Non-Renewal.[22]

### (d)     The Worst Patient Chart Incident

On December 19, 2020, Dr. Wadas was forwarded a Patient Chart that Dr. Chreky completed by one of UPMC's quality reviewers.  (DSOF ¶91)  The patient chart must contain, among other things, chief complaint, history, physical exam, vital signs, lab work, and the provider's decision-making process, and chart documentation is a very important part of a physician's performance, communicating information to other health care providers about the care of the patient.  (DSOF ¶¶92-93)  Dr. Wadas testified that the Patient Chart was unacceptable and probably one of the worst he had ever seen.  (DSOF ¶97)  According to Dr. Wadas, "there was essentially nothing on the chart… It couldn't even meet the need for the most basic reason we have a chart, which is to communicate care to other providers."  (DSOF ¶96)  On December 19, 2020,

---

[22] *See, e.g., Ball v. Einstein Cmty. Health Assocs., Inc.,* 514 F. App'x 196, 201-02 (3d Cir. 2013) (affirming summary judgment for employer, noting, "Even if a factfinder credited all of [the physician's] innocent explanations for that seemingly-incriminating data, those explanations would, at best, suggest 'that the employer's decision was wrong or mistaken, not that [the employer] fabricated its concern.").

Dr. Wadas emailed Dr. Chreky, asking him to review and explain the information contained in the Patient Chart.  (DSOF ¶95)  Dr. Chreky acknowledged the poor dictation on the chart and stated, among other things, that his description of the patient's gate was inaccurate and based on an inadvertent "click."  (DSOF ¶98) There is no evidence that the report about Dr. Chreky's chart quality or any consequences arising therefrom were improperly motivated by age discrimination.

2.    *No Genuine Issues of Material Fact*

Dr. Chreky received a rating of Requires Improvement rating on his 2020 Performance Review.  (DSOF ¶76)

> This year has been however challenging for Dr. Chreky.  He has had [sic] confrontation with the APP and with the inpatient team requiring administrative intervention and HR involvement. Opportunity to enhance his communicative skills and his relationship with colleagues aligned with UPMC values was discussed with him and he is eager to work on it in the coming year.
>
> (DSOF ¶80)

The September 2020 Confrontation with T.H. and the November 2020 Confrontation with C.R. predated the 2020 Performance Review.  Dr. Chreky disputed his 2020 Performance Review, specifically describing his account of the foregoing events in his handwritten response.  (DSOF ¶82)  Nowhere in his response does Dr. Chreky assert that T.H., C.R., or anyone else at UPP fabricated, distorted, or otherwise took actions against Dr. Chreky based on his age.  (*Id.*)

Shortly thereafter, the Wrong Medication Incident and the Worst Patient Chart Incident occurred.  UPP had legitimate, non-discriminatory reasons for its handling of any of the foregoing incidents, including but not limited to Dr. Chreky's performance rating and UPP's nonrenewal decision.  Even if Dr. Chreky's version or account of the foregoing incidents differ from his supervisors, but offers no reason to doubt that the incident occurred or that it was reported to his

supervisors, this is not evidence of pretext.[23]  Despite Dr. Chreky's belief that the incidents leading up to his Non-Renewal were "non-severe" or "minor," this is insufficient to avoid summary judgment.[24]  Nor can he establish that his age was the reason for his Non-Renewal by "[m]erely reciting that discrimination was the reason for the decision ..."[25]  Dr. Chreky's arguments fail "to create sufficient disbelief so that a factfinder could rationally find that [UPP] did not rely on these reasons in disciplining [Dr. Chreky]."[26]  Where, as here, there is a multitude of "serious, independent, documented, and therefore good faith complaints against Plaintiff,"[27] there is no reason to discredit UPP's stated reasons for Dr. Chreky's Non-Renewal.  Decisionmakers' testimony, contemporaneous documentary evidence, and Dr. Chreky's own admissions support that these incidents occurred and that he lacked the insight and self-awareness to correct his behaviors.[28]  A plaintiff's reliance on nothing more than their own subjective assessment of their performance fails to create genuine issues of material fact for purposes of summary judgment.[29]

---

[23] *Emmett v. Kwik Lok Corp.,* 528 F. App'x 257, 261 (3d Cir. 2013) (affirming summary judgment against employee where "Plaintiff] admits that he raised his voice at [a colleague], but claims that he was not… 'out of control screaming and yelling'" and where employee admitted that, after the incident, employee's supervisor "asked him to call [his colleague] and 'kind of smooth things over.'")

[24] *See, e.g., Javornick v. United Parcel Serv., Inc.*, No. CIV.A. 07-0195, 2008 WL 4462280, at *8 (W.D. Pa. Sept. 29, 2008) (finding that plaintiff's opinion that her performance issues were not severe enough to warrant termination did not defeat summary judgment).

[25] *Javornick v. United Parcel Serv., Inc.*, No. CIV.A. 07-0195, 2008 WL 4462280 at *8 (W.D. Pa. Sept. 29, 2008) (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir.1991)).

[26] *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 648-49 (3d Cir. 2015).

[27] *Saenger*, 706 F. Supp. 2d at 509.

[28] *See Chernicoff v. Pinnacle Health Med. Servs.,* No. 1:14-CV-1990, 2016 WL 5373631 at *7 (M.D. Pa. Sept. 26, 2016) (granting summary judgment in favor of defendant health system where physician failed to demonstrate pretext as to health system's "anecdotal references to physician's poor work performance and poor attitude toward his employment, coworkers and patients.")

[29] *Parish v. UPMC Univ. Health Ctr. Of Pittsburgh*, 373 F.Supp.3d 608, 623 at FN. 104-105 (noting that plaintiff failed to support with actual record evidence that her actions, contrary to her supervisors' opinions, did not warrant concern for patient safety or militated in favor of a different conclusion).

In a similar case where a nurse practitioner was terminated from employment for using profanity, raising her voice with other members of the NICU, and a severe patient care issue, the Third Circuit upheld the District Court's grant of summary judgment in favor of the employer. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 648-49 (3d Cir. 2015) (affirming summary judgment for employer, noting, "Since [Plaintiff] admits to the disciplined conduct, and in light of [the hospital's] goal of maintaining the NICU as an environment in which patients and their families feel safe, [Plaintiff] has not shown that [her supervisor's] reason is so weak as to render it 'unworthy of credence.'") (citations omitted)  Though the Plaintiff in *Willis* argued that "the notion that talking loudly could be the basis for discipline is so ludicrous that it cannot be a rational employer's true reason for acting," Third Circuit upheld the District Court's finding that, "It is rational, as the District Court aptly noted, that [the supervisor] 'perceived [this incident] to be another instance of harsh or offensive interpersonal communication by [the Plaintiff].'"

3.    *Dr. Chreky Has Not and Cannot Identify Any Substantially Younger, Similarly Situated Employees Who Were Treated More Favorably.*

Under the second prong of *Fuentes*, a plaintiff may establish pretext by pointing to evidence that: "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably."[30]  Dr. Chreky can establish none of these.  Here, Dr. Chreky has not and cannot proffer evidence that UPP discriminated against him in the past.  He also cannot establish, beyond mere speculation, that UPP discriminated against others within his protected class as a matter of law.  While "'similarly situated' does not mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'

---

[30] *Willis,* 808 F.3d at 645.

Which factors are relevant is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"[31] "[P]urported comparators must have committed offenses of 'comparable seriousness.'"[32] Here, Dr. Chreky cannot identify any substantially younger physician with an equally serious pattern of misconduct was treated more favorably than him. Rather, the record shows that other physicians who exhibited a similar pattern of clinical and behavioral issues as Dr. Chreky were treated identically. Thus, Dr. Chreky has not been able to satisfy the second *Fuentes* prong to establish pretext.

4.     *Dr. Chreky's Testimony Undercuts Claim of But-For Causation*

Dr. Chreky "has not pointed to record evidence—beyond conclusory statements and suspicions—to support his claim that discriminatory animus was … a … but-for cause of his termination."[33] Dr. Chreky's own testimony undercuts his argument that his age was the but-for cause of his Non-Renewal. There is no evidence that Dr. Chreky reported any age discrimination whatsoever for any reason. (DSOF ¶¶123-128) To the contrary, Dr. Chreky recalls expressing that what happened with C.R. was the basis for his Non-Renewal. (DSOF ¶124)

---

[31] *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (internal citations omitted).

[32] *Id.* at *223 (finding no genuine issue of material fact where each purported comparator involves mitigating circumstances that distinguished their conduct from the plaintiff's).

[33] *Laymon v. Honeywell Int'l Inc.*, 645 F. Supp. 3d 443, 457 (W.D. Pa. 2022) (Hornak, J.).

**B.    Dr. Chreky Failed to Plead or Exhaust Administrative Remedies Regarding His Retaliation and Harassment Claims.**

(i)    Failure to exhaust administrative remedies.

Only claims that were included in a plaintiff's EEOC complaint, or those reasonably related to those in the administrative charge, will be considered administratively exhausted.[34]  However, Dr. Chreky has failed to exhaust his administrative remedies under the ADEA as to these claims.[35] Dr. Chreky failed to exhaust his administrative remedies as to the retaliation and harassment claims, as his Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) failed to allege either retaliation or a hostile work environment, nor any facts that would reasonably lead the EEOC to investigate such claims.  (Sec. Am. Compl., Ex. 1)  Dr. Chreky failed to check the box on his EEOC charge for retaliation, nor did he make any reference to or allege any facts to support harassment or hostile work environment claims.  In fact, Dr. Chreky's EEOC charge bolds the reference to discrimination.  Only claims that were included in a plaintiff's EEOC complaint, or those reasonably related to those in the administrative charge, will be considered administratively exhausted.[36]  Where, as here, plaintiffs have failed to meet the ADEA's exhaustion requirement, courts have granted summary judgment as to those claims.[37]

---

[34] *Kopko v. Lehigh Valley Health Network*, 776 Fed. App'x. 768, 773 (3d Cir. 2019) (affirming dismissal of ADEA retaliation claim where plaintiff employee failed to include in administrative charge any reference to plaintiff's opposition to such age discrimination that could have resulted in employer retaliating against her, finding that plaintiff's claim of age retaliation is not reasonably related to her claim of age discrimination).

[35] Defendant's Answer and Aff. Def. to Sec. Am. Compl. (Twentieth Affirmative Defense).  *See also Theodore v. Newark Dep't of Health & Cmty. Wellness*, No. CV 2:19-17726 (WJM), 2024 WL 1154473, at *5 (D.N.J. Mar. 18, 2024) ("As a threshold matter, before seeking remedies under Title VII or the ADEA, a plaintiff must exhaust all required administrative remedies.")

[36] *Kopko v. Lehigh Valley Health Network*, 776 Fed. App'x. 768, 773 (3d Cir. 2019).

[37] *Schultz v. Goldbelt Glacier Health,* 713 F. App'x 121, 127 (3d Cir. 2017) (affirming grant of summary judgment on ADEA claim in favor of employer where plaintiff failed to exhaust her administrative remedies).

(ii)    <u>No facts supporting harassment or retaliation.</u>

Further, Dr. Chreky's Second Amended Complaint fails to state a claim for retaliation or harassment.  The Second Amended Complaint is devoid of factual assertions, short of conclusory statements, that would survive the notice pleading requirement in *Iqbal*.[38]  "In short, such [claims] are not in the case"[39] and should not be raised at summary judgment.

Dr. Chreky baldly alleges harassment and retaliation in the Second Amended Complaint without facts to support the elements of the claim. As to his harassment claim, Dr. Chreky alleges only: "In discriminating against and harassing Plaintiff because of Plaintiff's age, Defendant violated the ADEA."  (Sec. Am. Compl. ¶ 24)  As to his retaliation claim, Dr. Chreky alleges only bare assertions that "Plaintiff attempted to address his concerns with UPMC's Human Resources department but was met with resistance and inaction," and "Plaintiff engaged in protected activity by reporting age discrimination to UPMC's Human Resources department," and "UPMC retaliated against Plaintiff by terminating his employment in violation of the ADEA [or PHRA]."  (*Id*. ¶¶19, 27-30)  These conclusory allegations not only fail to stand up to the *Iqbal* pleading requirements, but are also belied by Dr. Chreky's testimony, as discussed further below.

Notwithstanding the foregoing, even if Dr. Chreky could pursue claims of harassment or retaliation under the ADEA, he has not adduced any record evidence to support either claim.  To establish *a prima facie* case of retaliation, Dr. Chreky must show (1) he engaged in protected employee activity; (2) he suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the

---

[38] *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009) (holding that plaintiffs must allege more than a "formulaic recitation of the elements").

[39] *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 638 (W.D. Pa. 2019) (J. Hornak), *cause dismissed sub nom. Par. v. Univ. Health Ctr. of Pi*, No. 19-2049, 2019 WL 5884996 (3d Cir. July 24, 2019)

purported protected activity and the adverse action.[40]  Here, Dr. Chreky has failed to set forth any evidence that he engaged in a protected activity.  The record is clear that Dr. Chreky did not report age discrimination to any of the decision-makers in this case.  Dr. Chreky testified that he does not recall complaining to anyone in HR or anywhere else that he believed that his Non-Renewal was based on his age.  He did not file a grievance with HR upon receiving notice of his Non-Renewal.  (DSOF ¶¶ 123-128)    Further, Dr. Chreky cannot establish a causal connection between any purported protected activity and his Non-Renewal.  As discussed more fully above, UPP had legitimate, non-discriminatory reasons for non-renewing Dr. Chreky, and Dr. Chreky cannot establish that these reasons were pretextual.  Accordingly, Dr. Chreky's ADEA retaliation claim should be dismissed with prejudice.

Similarly, there is no evidence that Dr. Chreky suffered from any severe or pervasive conduct amounting to unlawful harassment based on his age.[41]  Dr. Chreky never set forth any evidence – nor even alleged – that anyone at UPP, especially not supervisors or leadership, made any comments or engaged in any conduct that could reasonably constitute "severe and pervasive" discrimination based on his age.

---

[40] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

[41] The elements of a hostile work environment claim under the ADEA are: "1) [T]he employee suffered intentional discrimination because of his/her [protected status], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Grossberg v. Hudson Cnty. Dep't of Hum. Servs.*, 740 F. App'x 762, fn 9 (3d Cir. 2018) (citing *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

For the foregoing reasons, Dr. Chreky's harassment claim fails.  For all of the foregoing reasons, UPP respectfully requests that the Court grant its Motion for Summary Judgment in favor of UPP and against Dr. Chreky in accordance with the proposed Order accompanying the Motion for Summary Judgment.

Respectfully submitted,

*/s/ Jennifer S. Park*

Jennifer S. Park
jennifer.park@dentons.com
PA ID 87733
Abigail Britton
abbie.britton@dentons.com
PA ID 333801

DENTONS COHEN & GRIGSBY P.C.
625 Liberty Avenue
Pittsburgh, PA  15222-3152
(412) 297-4900 / Fax: (412) 209-1975

Counsel for Defendant,
University of Pittsburgh Physicians

June 3, 2025

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing UPP's Memorandum of Law in Support of Defendant's Motion for Summary Judgment was filed electronically on June 3, 2025. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jennifer S. Park*
Jennifer S. Park