## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **EMILE CHREKY,** | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION: 2:23-cv-00856** |
| | : | |
| v. | : | |
| | : | |
| **UNIVERSITY OF** | : | |
| **PITTSBURGH PHYSICIANS,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................. 1

**STATEMENT OF FACTS**.................................................................................. 2

**LEGAL STANDARD**......................................................................................... 5

**ARGUMENT**....................................................................................................... 6

    **I. THE COURT WOULD NOT GRANT A RULE 50 MOTION AT TRIAL ON PLAINTIFF'S PRIMA FACIE CASE, AS SUCH, THE COURT CANNOT GRANT SUMMARY JUDGMENT**......................................................................... 6

      A. UPP Gets The Law Wrong Twice, Starting With The "Adverse Employment Action" Element................................................................................................. 6

      B. Replacing a 71-Year-Old Physician With A 34-Year-Old Physician Satisfies the Inference Of Discrimination Prong....................................................................... 7

    **II. BECAUSE A JURY COULD REASONABLY FIND THE EMPLOYER'S STATED REASON TO BE PRETEXTUAL, THE COURT CANNOT GRANT SUMMARY JUDGMENT. JUST AS IT WOULD BE IMPROPER TO GRANT A DIRECTED VERDICT UNDER RULE 50 ON THIS RECORD, IT IS EQUALLY IMPROPER TO GRANT SUMMARY JUDGMENT**......................................................................... 9

      A. The Record Contains Unambiguous, Direct Admissions of Age-Based Animus by Decisionmakers............................................................................................ 9

        1. Dr. Wadas's Age-Based Comments Directly Coincided With The Termination Decision............................................................................................... 10

    **III. UNDER FUENTES PRONG ONE, THE INCONSISTENCIES AND SHIFTING JUSTIFICATIONS IN UPP'S STATED REASONS PRECLUDE SUMMARY JUDGMENT JUST AS THEY WOULD PRECLUDE A DIRECTED VERDICT UNDER RULE 50**........................................................................................... 12

      **A. The Timeline of Dr. Kim's Recruitment and Dr. Chreky's Termination Reveals a Pretextual Plan to Replace an Older Physician**..................................... 12

      **B. UPP's Evolving Story Exposes Pretext and Raises a Triable Issue**...................... 14

        1. The "Soup Incident" Was a Routine Break, Not Misconduct................................. 17

        2. The Profanity Allegation Is Contradicted and Selectively Credited....................... 17

        3. The "Early Departure" Claim Lacks Basic Verification........................................ 18

        4. The "Worst Chart" Label Is Subjective and Inflated............................................. 19

        5. The EKG Mistake Was Neither Unusual Nor Disqualifying.................................. 19

**IV. UNDER FUENTES PRONG TWO, EVIDENCE THAT YOUNGER PHYSICIANS WERE TREATED MORE FAVORABLY – AND OLDER PHYSICIANS WERE SINGLED OUT – DEMONSTRATES PRETEXT**............................................................**20**

A. The Physician Assistance Program: Younger Physicians Survive Older Physicians Do Not..........................................................................................................................................20

B. Evidence Of Discrimination Against Others In His Protected Class............................22

**CONCLUSION**............................................................................................................**23**

## INTRODUCTION

Hospitals do not terminate emergency physicians with unblemished 18-year records without a reason. They do not remove the most senior and longest-serving doctor in a small emergency department absent extraordinary circumstances. Hospitals do not discard doctors because of a trivial interpersonal conflict. UPP does, however, discard old doctors when it is time for "new boots on the ground." When senior leadership sends emails about "removing dead wood" and installing "new leadership," those words mean exactly what they say. This is not speculation. It is common sense. And it is exactly what the record shows.

For nearly two decades, Dr. Emile Chreky served the McKeesport emergency room with distinction. His direct supervisor for most of that time, Dr. Rani Kumar, confirmed that he consistently performed well. For 18 years, Dr. Chreky's record was clean. That changed abruptly in late 2020, when a new leadership team took over and immediately began targeting older physicians for removal.

UPP's plan was explicit. The primary decision-maker declared his intention to "remove some dead wood," warned that Dr. Chreky was "not long for our world," and informed others, "He is gone in June." While saying these things, the same leadership team actively recruited Dr. Chreky's replacement – a physician almost 40 years younger – who began work the day after Dr. Chreky's termination.

The reason for UPP's decision was clear from the beginning, and it had nothing to do with performance. When Dr. Chreky's evaluations were too positive, UPP's decision-makers agreed they needed to alter Dr. Chreky's reviews post-hoc to justify the termination. When the EEOC got involved, UPP abandoned its original justification of "restructuring" and began

pointing to alleged misconduct. When that proved insufficient, it added new accusations years later.

The common-sense explanation is also the most credible. UPP wanted to move in a new direction with younger leadership and simultaneously replace the older physicians at the McKeesport hospital.  Leadership did not suspend Dr. Chreky, warn him, investigate the claims seriously, or escalate concerns about patient safety through peer review. Rather, UPP allowed Dr. Chreky to continue treating patients for six more months – without incident – after it decided not to renew his contract.

This is not a case about a medical error. It is a case about age discrimination. Like law firm equity partners, doctors are not easily terminated. Rather, in both professions – law and medicine – juniors push out seniors when they feel it is time. This is exactly what happened here. And it is illegal.

From Wadas, Richard J. <wadasrj@upmc.edu>
Sent: Thursday, November 19, 2020 9:34 AM
To: Harinstein, Matthew E <harinsteinme@upmc.edu>
Subject: RE: thoughts

Not really. While I know he will never change, he is consistently getting worse in the last year.

Plan for MCK – new leadership, remove some dead wood, improve every aspect of it.

The Court should deny summary judgment and allow a jury to weigh the facts. It is hard to imagine that a decision-maker could put the above in writing, and no material dispute of facts exists in this case.

## **STATEMENT OF FACTS**

Dr. Emile Chreky served as an emergency room physician at UPMC McKeesport for nearly two decades with an exemplary performance record. SAMF ¶1. For 18 years, Dr. Chreky maintained a clean record under Dr. Kumar, who testified that he "did a good job for all the

years." SAMF ¶2. Dr. Chreky consistently received positive evaluations until 2020, when UPP abruptly changed course. SAMF ¶2-3. University of Pittsburgh Physicians ("UPP") employed Dr. Chreky through successive one-year contracts. SAMF ¶4. Dr. Richard Wadas (Age 50), as Executive Vice Chair of Community Emergency Medicine, oversaw ER operations at UPMC McKeesport and served as the primary decision-maker regarding Dr. Chreky's employment. SAMF ¶5. Dr. Rani Kumar served as Dr. Chreky's direct supervisor as the McKeesport ER Site Chief until December 2020, when Dr. Sarah Flaherty, a significantly younger physician, replaced her. SAMF ¶6.  Heather Reading, UPP's HR Director, participated in personnel decisions, including Dr. Chreky's termination. SAMF ¶7.

In fall 2020, UPP targeted older physicians for removal. SAMF ¶8. On November 19, 2020, Dr. Wadas outlined his plan in an email to Dr. Harinstein: "Plan for MCK -- new leadership, remove some dead wood, improve every aspect of it." SAMF ¶10. Just ten days earlier, on November 9, 2020, Dr. Wadas had written about Dr. Chreky: "Between you and I, I don't think Chreky is long for our world." SAMF ¶9.

While targeting Dr. Chreky for termination, UPP actively recruited his replacement. SAMF ¶13. Dr. Paul Kim, a 30-year-old physician, visited McKeesport in November 2020 and briefly met Dr. Chreky. SAMF ¶14. By December 2020, Dr. Kim received his formal offer letter. SAMF ¶16. That same month, Dr. Wadas declared, "He [Chreky] is gone in June." SAMF ¶12. The timing was precise: Dr. Kim began work on July 1, 2021, the day after Dr. Chreky's last day. SAMF ¶32.

UPP finalized its decision to terminate Dr. Chreky by early December 2020. SAMF ¶17. On December 8, 2020, Dr. Radomski explicitly stated, "Ugh...looking to NOT renew him" and clarified that Dr. Chreky's evaluation "may be too positive if we are looking to renew him."

SAMF ¶18. The next day, Kristen Corbett, Director of Operations, agreed that Dr. Chreky's evaluation needed to be "tweaked" to align with the non-renewal decision. SAMF ¶19. By December 10, 2020, HR Director Reading confirmed in writing: "It is still our plan to nonrenew this physician." SAMF ¶20.

After deciding to terminate Dr. Chreky, UPP manufactured a paper trail to justify its decision. SAMF ¶21. Dr. Meyers questioned whether Dr. Chreky "really make[s] 'good, safe clinical decisions?'" on December 8, 2020, showing management was constructing a narrative to support the pre-determined termination. SAMF ¶22. Dr. Wadas suggested they "add that we have had some clinical concerns raised" to retroactively modify Dr. Chreky's evaluation. SAMF ¶23.

UPP's reasons for terminating Dr. Chreky evolved over time. SAMF ¶41. In March 2021, Dr. Wadas first told Dr. Chreky his contract would not be renewed due to "restructuring." SAMF ¶42. After Dr. Chreky filed an EEOC charge, UPP claimed it had non-renewed him because of three incidents: an alleged "disappearance" from the ER in September 2020; an incident involving profanity in November 2020; and a cardiology event where he allegedly gave a contraindicated drug. SAMF ¶43. In February 2024, UPP maintained these three reasons in sworn interrogatory responses. SAMF ¶44. Then, in June 2024, UPP added two new incidents: an October 2020 allegation that Dr. Chreky left early, leaving a heart attack patient with a PA; and a December 2020 claim of poor chart documentation. SAMF ¶47.

UPP systematically treated younger physicians more favorably than older ones. SAMF ¶71. Dr. S., age 43, admitted to using "racially offensive terms" in the workplace. SAMF ¶75, ¶77-78. He completed the Physician Assistance Program ("PAP") and kept his job. By contrast, Dr. Chreky (age 71) and Dr. C. (age 67) were terminated within months of completing PAP for less serious alleged misconduct. SAMF ¶78. Dr. Wadas claimed Dr. S.'s conduct was "an

isolated incident that he had good insight into, acknowledged, and it never happened again." SAMF ¶79. Yet both Dr. Chreky and Dr. C. also completed PAP with no documented evidence of repeated misconduct. SAMF ¶81.

Despite UPP's claims about performance issues, Dr. Chreky continued working without incident for six months after the December 2020 decision. SAMF ¶38. Dr. Flaherty, who supervised him during this time, testified she did not observe "a significant number of errors in difficulties with procedures or medications." SAMF ¶40. No new issues were documented after December 2020. SAMF ¶39. UPP formally notified Dr. Chreky of his termination on March 5, 2021, and his employment ended on June 30, 2021. SAMF ¶31.  Dr. Kim started immediately the next day as "a fully fledged attending physician" with no supervision. SAMF ¶34.

## LEGAL STANDARD

"Granting summary judgment is an extraordinary remedy." *Meigs v. Care Providers Ins. Servs., LLC*, No. 21-867, 2023 U.S. Dist. LEXIS 7141, at *13 (E.D. Pa. Jan. 13, 2023). Under these facts, the Court would not grant a Rule 50 motion at trial. It, therefore, should not grant summary judgment now.

The standard for summary judgment is identical to that for judgment as a matter of law under Rule 50. *Zuck v. Pa. Certified Organic, Inc.*, No. 4:19-CV-01983, 2021 U.S. Dist. LEXIS 212842, at *22 n.103 (M.D. Pa. Nov. 3, 2021) ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that the inquiry under each is the same"). And courts have recognized that "[t]he standard for granting a JNOV is stringent." *Miller v. N. Belle Vernon Borough*, No. 8-1435, 2011 U.S. Dist. LEXIS 77532, at *2 (W.D. Pa. July 18, 2011). Given that courts have emphasized the demanding standard for granting a judgment notwithstanding the verdict, it necessarily follows that obtaining summary judgment –

which cuts off a plaintiff's right to a jury trial before one is even held – requires meeting an equally high bar

The question is whether a reasonable jury could find in Dr. Chreky's favor based on the record. *Zuck*, 2021 U.S. Dist. LEXIS 212842, at \*9. In making that determination, the Court must view the record "in the light most favorable to [Dr. Chreky] and resolve all reasonable inferences in [his] favor." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999). The Third Circuit has repeatedly cautioned that "[i]ssues such as intent and credibility are rarely suitable for summary judgment," because "[d]iscriminatory intent means actual motive, and is a finding of fact to be determined by the factfinder." *Fieni v. Franciscan Care Ctr.*, No. 09-5587, 2011 U.S. Dist. LEXIS 113910, at \*13–15 (E.D. Pa. Sep. 30, 2011) (emphasis added).

## ARGUMENT[1]

### I. THE COURT WOULD NOT GRANT A RULE 50 MOTION AT TRIAL ON PLAINTIFF'S PRIMA FACIE CASE, AS SUCH, THE COURT CANNOT GRANT SUMMARY JUDGMENT.

#### A. UPP Gets The Law Wrong Twice, Starting With The "Adverse Employment Action" Element.

UPP contests two elements of Chreky's *prima facie* case: adverse employment action and inference of discrimination. UPP's arguments are unavailing.

First, regarding the "adverse employment action," UPP gets the law wrong twice. As an initial matter, binding authority recognizes that non-renewals *were* adverse employment actions. *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009) ("We note that, in reaching this decision, we join other circuit courts that have, either implicitly or explicitly, held that non-renewal of a contract may constitute an adverse employment action for purposes of the

---

[1] Plaintiff is not pursuing his hostile work environment or retaliation claims at this stage and focuses this opposition on his age discrimination claim, for which there is substantial direct and circumstantial evidence sufficient to defeat summary judgment.

discrimination laws."); *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) ("The failure to renew an employment arrangement, whether at-will or for a limited period of time, is an employment action, and an employer violates Title VII if it takes an adverse employment action for a reason prohibited by Title VII . . . .")

Plaintiff bolds and italicizes the word *were* (*see* above) to highlight UPP's second legal error. Even if binding Third Circuit precedent did not belie UPP's position, the United States Supreme Court's recent decision obliterates it. The old adverse employment action standard no longer exists. All a Plaintiff needs to do is show "some harm," not a materially adverse action. *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024). Not renewing Dr. Chreky's employment contract after almost two decades of excellent performance satisfies this standard. The Court should disregard UPP's argument.

### B. Replacing a 71-Year-Old Physician With A 34-Year-Old Physician Satisfies the Inference Of Discrimination Prong.

Replacing Dr. Chreky (71 years old) with Dr. Kim (34 years old)[2] raises an inference of discrimination and necessitates a denial of summary judgment. A plaintiff must establish a *prima facie* case by proffering sufficient evidence from which a jury could determine that – for the fourth element of the test – he was replaced by a person "sufficiently younger" or there is evidence surrounding the adverse action that gives rise to an inference of discrimination. *Deangelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 580 (E.D. Pa. 2010). In *Sempier v. Johnson & Higgins*, the Third Circuit directly addressed the replacement element in age discrimination cases involving a staged succession of duties. 45 F.3d 724 (3d Cir. 1995).

Sempier's staged replacement facts parallel this case:

---

[2] An age difference of ten years or older between an employee and his replacement creates an inference of discrimination in the Third Circuit. *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 764-65 (3d Cir. 1989) (holding that a ten-year age difference was sufficient to support an inference of age discrimination).

In *Sempier*, the employer transferred the plaintiff's duties in stages:

- **December 1989**: Alan Page (14 years younger) hired as CIO, taking over MIS responsibilities.

- **May 1990**: Thomas Carpenter (4 years younger) hired for Human Resources/Professional Development.

- **June 1991**: Sempier forced out after his remaining duties were eliminated.

*Sempier*, 45 F.3d at 724, 725-27, 729-30. The Third Circuit explicitly rejected the defendant's argument that only the final replacement should be considered or that the replacement had to be one-to-one. *See id* at 729-30. The Third Circuit's approach in *Martinez v. UPMC Susquehanna* further supports this analysis, holding that "[n]ot all of a plaintiff's duties have to go to a single replacement; the replacement's job does not have to match the plaintiff's job exactly." 986 F.3d 261, 267 (3d Cir. 2021).

Here, the replacement evidence is even stronger than *Sempier*. Dr. Kim's immediate succession and progression demonstrates systematic replacement:

- **June 30, 2021**: Dr. Chreky's last day as an emergency room physician at McKeesport. SAMF ¶32.

- **July 1, 2021**: Dr. Kim started as an emergency room physician, assigned half-time to McKeesport (750 hours). SAMF ¶33.

- **January 2022**: Dr. Kim moved to full-time emergency medicine at McKeesport. SAMF ¶35.

Dr. Kim replaced Dr. Chreky. Unlike *Sempier*, where the employer split duties between two people in different roles, UPP assigned all of Dr. Chreky's job responsibilities to Dr. Kim just six months after terminating Dr. Chreky. SAMF ¶35. Dr. Kim testified that he started

8

working as "a fully fledged attending physician" with no supervision, immediately "starting" with patients on his first day. SAMF ¶34. Under *Sempier* and *Martinez*, Dr. Kim's immediate assumption of Dr. Chreky's emergency medicine duties at the same location, followed by progression to full-time coverage within six months, establishes the replacement element for Dr. Chreky's age discrimination claim.

Even if this replacement evidence were somehow insufficient – and it plainly is not – the mountain of pretext evidence (also independent evidence of discrimination) discussed below would independently satisfy the fourth prong. *See May v. Hobart Corp.*, 839 F. Supp. 309, 313 (E.D. Pa. 1993) ("Substantial precedent indicates that proof of pretext can satisfy a discrimination plaintiff's entire burden.").

## II. BECAUSE A JURY COULD REASONABLY FIND THE EMPLOYER'S STATED REASON TO BE PRETEXTUAL, THE COURT CANNOT GRANT SUMMARY JUDGMENT. JUST AS IT WOULD BE IMPROPER TO GRANT A DIRECTED VERDICT UNDER RULE 50 ON THIS RECORD, IT IS EQUALLY IMPROPER TO GRANT SUMMARY JUDGMENT.

UPP has given reasons for termination. SAMF ¶44. So the burden swings back to Dr. Chreky to demonstrate that their reasons are pretextual.[3] In this case, that is not a heavy lift.

### A. The Record Contains Unambiguous, Direct Admissions of Age-Based Animus by Decisionmakers

Dr. Wadas' age-related comments foreclose summary judgment. Dr. Wadas made three categories of age-related statements that constitute direct evidence of discrimination: (1) mortality-based comments suggesting Dr. Chreky was too old ("not long for our world"); (2) derogatory stereotypes about older workers ("dead wood" who "will never change"); and (3) explicit declarations of his termination plan ("He is gone in June"). These statements, made by the primary decision-maker during the termination process, require minimal inference to

---

[3] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (the familiar standard for burden-shifting in employment cases).

establish discriminatory motive. This is direct evidence. "Direct evidence" means evidence sufficient to allow a jury to find that "the decision makers placed substantial negative reliance on [the plaintiff's age] in reaching their decision" to terminate employment. *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998).

### 1. Dr. Wadas's Age-Based Comments Directly Coincided With The Termination Decision

The record establishes that UPP made the final decision to terminate Dr. Chreky by early December 2020, as confirmed by HR Director Reading's December 10, 2020 email stating: "It is still our plan to nonrenew this physician." SAMF ¶20. This timing is critical because Dr. Wadas's age-discriminatory comments occurred simultaneously with this decision-making process. SAMF ¶¶8, 17-20.

The record conclusively establishes that UPP made the final decision to terminate Dr. Chreky by early December 2020. Multiple contemporaneous email threads document this timeline:

1. On December 8, 2020, Dr. Radomski explicitly states, "**Ugh...looking to NOT renew him**" and clarifies that Dr. Chreky's positive evaluation "**may be too positive if we are looking to renew him**" SAMF ¶18. This confirms the decision was already made.

2. The next day, on December 9, 2020, Kristen Corbett, Director of Operations, agreed Dr. Chreky's evaluation needed to be "tweaked" to align with the non-renewal decision SAMF ¶19.

3. Dr. Meyers questioned whether Dr. Chreky "**really make[s] 'good, safe clinical decisions'?**" on December 8, 2020, indicating management was constructing a narrative to justify the pre-determined termination SAMF ¶22.

4. By December 10, 2020, Dr. Wadas confirmed the decision when he wrote they could "**add that we have had some clinical concerns raised**" to retroactively modify Dr. Chreky's evaluation SAMF ¶23. This email thread proves UPP was retroactively manufacturing performance issues to justify a termination decision already made on other grounds.

5. HR Director Reading's December 10, 2020 email (referenced in your brief) further confirms that "**It is still our plan to nonrenew this physician**," establishing that the decision was firm by early December at the latest. SAMF ¶20.

This timing is critical because Dr. Wadas's age-discriminatory comments occurred simultaneously with this decision-making process. This documented plan to manipulate performance reviews destroys any claim of good faith belief in their stated reasons, as demonstrated below:

1. On November 19, 2020 – just weeks before the confirmed decision – Dr. Wadas wrote to Dr. Harinstein: "**While I know he will never change, he is consistently getting worse in the last year**" followed immediately by "**Plan for MCK – new leadership, remove some dead wood, improve every aspect of it.**" SAMF ¶11. This statement directly connects Dr. Chreky to "dead wood" – a well-recognized derogatory term for older employees viewed as inflexible and unproductive due to age.

2. In the same November 19, 2020 email thread, Dr. Wadas definitively states: "**He is gone in June. We will notify him in February.**" (SAMF ¶12). This confirms that the termination decision was already made at this point, concurrent with the age-based comments.

3. Just ten days earlier, on November 9, 2020, Dr. Wadas wrote to Dr. Harinstein: "**Between you and I, I don't think Chreky is long for our world. Interpersonal skills aside, clinical concerns are growing.**" (SAMF ¶9). This mortality-referencing language occurred in the same month as the termination decision and came directly from the primary decision-maker. Dr. Wadas also stated that UPP needs "**new boots on the ground.**" *Id.*

As the acknowledged decision-maker, Dr. Wadas's age-related comments constitute direct evidence of discrimination because they were made contemporaneously with the termination decision and reflect consideration of age in that process. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002). He explicitly linked his intent to "remove some dead wood" with his view that Dr. Chreky "will never change" and is "getting worse." These stereotypes are commonly associated with older workers' perceived inability to adapt. These statements directly connect age-based bias to the adverse action, requiring minimal inference to support a finding of discriminatory motive.

This age-based framing did not end with Dr. Wadas. UPMC replaced Dr. Kumar with a significantly younger supervisor, Dr. Flaherty, who soon echoed similar views. She reinforced

that age directly influenced leadership's perception of Dr. Chreky. SAMF ¶6. In an April 12, 2021 email, Dr. Flaherty wrote, "I wish he [were] just leaving with some degree of grace and we could treat it as retirement and 'thank' him for all his service... instead it is just super awkward." SAMF ¶29. She then asked whether to frame his departure as "With the retirement of Dr. Chreky…?" SAMF ¶30. These comments, though post-decision, confirm that decision-makers viewed Dr. Chreky through an age-based lens. This search for a cover story reveals consciousness of guilt because legitimate terminations do not need false narratives about retirement. Alongside Dr. Wadas's statements, Dr. Flaherty's commentary provides direct evidence that age substantially motivated the termination.

Dr. Wadas's ageist remarks – calling Dr. Chreky "dead wood," claiming he would "never change," and saying he was "not long for our world" – were made by the decision-maker around the time of the termination. These comments, along with UPP's manufactured paper trail, support the conclusion that age, not performance, was the true motivation. When combined with Dr. Wadas's explicit ageist language ("dead wood," inability to change, not "long for our world"), these emails provide direct evidence that age discrimination motivated the termination decision. These statements directly link age-based bias to the adverse action, leaving little room for inference. Summary judgment should therefore be denied.[4]

III.    **UNDER FUENTES PRONG ONE, THE INCONSISTENCIES AND SHIFTING JUSTIFICATIONS IN UPP'S STATED REASONS PRECLUDE SUMMARY JUDGMENT JUST AS THEY WOULD PRECLUDE A DIRECTED VERDICT UNDER RULE 50**

---

[4] Even if the Court does not characterize these remarks as "direct evidence" they are temporally close enough in time to be considered sufficiently powerful circumstantial evidence to mandate the denial of summary judgment. *Kepple v. GPU, Inc.*, 2 F. Supp. 2d 730, 747-49 (W.D. Pa. 1998) (the court found that while the employee failed to provide direct evidence of age discrimination, circumstantial evidence, including age-related comments by top management, was sufficient to survive summary judgment); *see also Kargbo v. Phila. Corp.*, 16 F. Supp. 3d 512, 525 (E.D. Pa. 2014).

A. *The Timeline of Dr. Kim's Recruitment and Dr. Chreky's Termination Reveals a Pretextual Plan to Replace an Older Physician*

The sequence of events in late 2020 reveals a deliberate campaign to replace Dr. Chreky with a significantly younger physician under the pretext of performance issues. The evidence shows a calculated effort to replace 71-year-old Dr. Chreky with 30-year-old Dr. Kim. SAMF ¶13. For 18 years, Dr. Chreky had a clean record under Dr. Kumar, who testified that he "did a good job for all the years." SAMF ¶2. That changed abruptly in Fall 2020. SAMF ¶3. Around the same time, Dr. Radomski began recruiting Dr. Kim and "singled out" McKeesport as a target. SAMF ¶15. The timing is no coincidence. "The timing of an employee's dismissal may raise an inference that an employer's purported reasons for terminating him were pretextual." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639 (3d Cir. 1993). All five alleged performance incidents occurred during the short window when Dr. Kim was interviewing and received his offer in December 2020. SAMF ¶47.

The recruitment timeline reveals the true motive. Dr. Kim visited McKeesport in November 2020 and briefly met Dr. Chreky. SAMF ¶16. By December, Dr. Kim received his formal offer letter. SAMF ¶14. That same month, Dr. Wadas told Dr. Kumar, "He [Chreky] is gone in June." SAMF ¶12. He also made clear his intent to "remove some dead wood." SAMF ¶10. By December 10, UPP had finalized the decision. SAMF ¶20. Yet one of the alleged incidents justifying non-renewal occurred on December 19, after UPP made the decision. SAMF ¶25.

Once Dr. Kim accepted the job, the alleged problems with Dr. Chreky stopped. SAMF ¶36. He continued working for another six months without incident. SAMF ¶37. No new issues were documented after December 2020. SAMF ¶39. Dr. Flaherty, who supervised him during this time, testified she did not observe "a significant number of errors in difficulties with

13

procedures or medications." SAMF ¶40. This sudden end to allegations strongly suggests they were manufactured to justify a replacement. After 18 years of exemplary performance, Dr. Chreky suddenly faced five disciplinary issues within the exact three-month window when UPP was recruiting his replacement, a statistical impossibility that raises concerns about pretext. SAMF ¶1-2.

The timing was exact. Dr. Kim began work on July 1, 2021, the day after Dr. Chreky's last day. SAMF ¶32. He started immediately as "a fully fledged attending physician" with no supervision. SAMF ¶34. Six months later, he increased to full-time. SAMF ¶35. No gap in coverage. No ongoing concerns about Dr. Chreky. Just a carefully timed transition that supports one conclusion: UPP engineered a false paper trail to justify replacing an older physician with a younger one.

### B.  UPP's Evolving Story Exposes Pretext and Raises a Triable Issue

UPP cannot obtain summary judgment because its evolving justifications for Dr. Chreky's non-renewal expose pretext. UPP first told Dr. Chreky the decision was due to "restructuring." SAMF ¶42.  Later, it gave three different reasons to the EEOC. SAMF ¶43. It repeated those three in verified interrogatory responses. SAMF ¶44.  Then, it added two entirely new incidents in amended interrogatory responses. SAMF ¶47. This four-stage shift is precisely the kind of inconsistency courts recognize as evidence of discrimination.

Courts consistently find that changing reasons for termination suggest pretext. "Inconsistencies" and "contradictions" in an employer's story are probative. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 2004). Employers do not need to contradict themselves outright. Offering new explanations is enough. *See Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646 (4th Cir. 2002). "[T]he ever-changing nature" of a company's reasons "detract[s] from

their legitimacy." *Abramson v. William Paterson College*, 260 F.3d 265, 284 (3d Cir. 2001). A jury may find pretext when an employer gives "vague explanations" initially, then changes its story after litigation begins. *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991).

Here is the evolution of UPP's shifting reasons for terminating Dr. Chreky.

**Stage One:** The Explanation to Dr. Chreky:

In March 2021, Dr. Wadas told Dr. Chreky his contract would not be renewed due to "restructuring." SAMF ¶42.  UPP has no record of any other reason given at the time.

**Stage Two**: The EEOC Position Statement:

UPP later claimed it non-renewed Dr. Chreky because of three incidents:

1. An alleged "disappearance" from the ER in September 2020;

2. An incident involving profanity in November 2020;

3. A cardiology event where he allegedly gave a contraindicated drug.

   (SAMF ¶43.)

**Stage Three:** Original Interrogatory Responses:

In February 2024, UPP stuck with these three incidents. HR Director Heather Reading verified the responses under oath. SAMF ¶45. Reading testified these were "the only reasons" she knew of when recommending non-renewal. SAMF ¶46.

**Stage Four:** Amended Responses with a new verifier:

In June 2024, UPP added two new incidents:

A. An October 2020 allegation that Dr. Chreky left early, leaving a heart attack patient with a PA;

B.  A December 2020 claim of poor chart documentation.

(SAMF ¶47.)

This time, Dr. Wadas – not Ms. Reading – verified the response.SAMF ¶48.

This evolution – from "restructuring" to three incidents, then to five – exposes a shifting narrative that courts routinely recognize as pretext. *See William Paterson Coll.*, 260 F.3d at 284. The timing is especially telling: UPP abandoned its business justification only after Dr. Chreky filed his EEOC charge. Its later reliance on alleged misconduct, including an incident that occurred after the decision was made, further undermines credibility.

The change in verifiers also matters. Heather Reading, who recommended the non-renewal, verified the original reasons but was unaware of the new ones. Her December 10, 2020, email confirms the decision had already been made before the added incidents occurred. SAMF ¶24. A reasonable jury could find that UPP manufactured post hoc justifications to mask a discriminatory motive.

These inconsistencies – both in substance and source – create a genuine dispute of material fact. Under the Rule 50 standard, a jury could reject UPP's evolving story and infer pretext. Summary judgment must be denied.

### C.  Inconsistencies Beyond UPP's Changing Reasons

Even if UPP had offered consistent reasons for Dr. Chreky's termination, summary judgment would still be improper under *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). A plaintiff may defeat summary judgment not only by showing that an employer shifted its reasons, but also by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in those reasons that a jury could find them unworthy of credence. *Id.* at 765. That is precisely the case here.

UPP's proffered rationales do not hold up under scrutiny. Each contains critical flaws, ranging from factual contradictions and failures to investigate to disproportionate discipline and post hoc exaggeration. A jury could find each of these five that UPP proffers contain weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions. And therefore these proffered reasons are pretextual. Even if the court finds that some of UPP's reasons hold up – which it should not – Dr. Chreky needs only to cast doubt on a fair number of them. *See Fuentes*, 32 F.3d 759, 764–65 n.7 ("If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder.")

Dr. Chreky does more than enough to cast substantial doubt on a fair number of UPP's reasons for termination. Summary judgment should not be granted.

**1. The "Soup Incident" Was a Routine Break, Not Misconduct**

UPP's claim that Dr. Chreky "disappeared" from the ER collapses under the weight of its own admissions. The facts show he briefly left to change soiled clothing. Dr. Wadas admitted this explanation was "certainly plausible." SAMF ¶49. Dr. Wadas pivoted his testimony, calling the issue one of failing to notify staff. SAMF ¶50.

UPP's reaction to Dr. Chreky's brief absence – to change soiled clothing – is a disproportionate response that inflates a minor, explained event into a supposed act of misconduct. HR Director Reading confirmed that the clinical team – not HR – should decide whether such an absence was appropriate. SAMF ¶51. She also confirmed that Dr. Chreky explained exactly where he had gone and why. SAMF ¶52. UPP's conclusion falls apart when even its own witnesses acknowledged both the plausibility of Dr. Chreky's explanation and the

fact that UPP appears to be nitpicking[5] him to death, treating a brief clothing change as grounds for termination.

### 2. The Profanity Allegation Is Contradicted and Selectively Credited

UPP's profanity allegation rests on a disputed account, contradicted by an eyewitness and undermined by its own selective treatment of the evidence. A staff member alleged that Dr. Chreky called him a "fucker." But the only eyewitness – positioned just eight feet away – directly refuted that account, saying "At no time was Dr. Chreky disrespectful, unprofessional or vulgar." SAMF ¶53.

Dr. Chreky said he did not recall the exact words, but he might have said, "fuck it." SAMF ¶54. That is not a slur; it is a general expression of frustration.

Despite this conflicting evidence, UPP – by and through Dr. Wadas – credited only the most incriminating version. Ms. Reading admitted that "saying he might have sworn doesn't mean he did." SAMF ¶55. Yet that possibility became fact in UPP's narrative. Such selective crediting raises credibility issues a jury must resolve.

### 3. The "Early Departure" Claim Lacks Basic Verification

UPP alleges that Dr. Chreky left early during a shift, leaving a STEMI patient with a PA. SAMF ¶47. Yet no investigation followed. SAMF ¶56. Dr. Wadas admitted he never spoke to the incoming physician, the person best positioned to confirm or deny the claim. SAMF ¶57. In fact, he expected such a handoff would have occurred. SAMF ¶58. Only one person raised the issue. SAMF ¶59. No nurse, staff member, or physician corroborated the account. SAMF ¶60. Despite the alleged seriousness of the incident, UPP generated no report, documentation, or formal

---

[5] Nitpicking can evidence discrimination/pretext. *See Baughman v. Cheung Enters.*, LLC, No. 1:13-CV-1511, 2014 U.S. Dist. LEXIS 125799, at *40-41 (M.D. Pa. Sep. 9, 2014) ("reasonable jury could conclude that the 'nitpicking' Plaintiff endured at the hands of Matei was a means to getting Plaintiff to quit")

review. That omission undermines its credibility. *Fullerton v. Pottstown Hosp. Corp.*, No. 15-5329, 2016 U.S. Dist. LEXIS 90624, at *21 (E.D. Pa. July 13, 2016) ("[A] a jury could question the validity of [defendant's] decision to terminate [plaintiff] without conducting any investigation, particularly as the hospital's termination policy allowed for investigative suspensions and encouraged issuing a disciplinary suspension before firing an employee.").

A jury could find it implausible that such a serious event occurred and yet no one investigated it, documented it, or mentioned it until long after litigation began.

### 4. The "Worst Chart" Label Is Subjective and Inflated

UPP's claim about the "worst chart" is both factually inaccurate and grounded in subjective, unreliable standards that courts treat with skepticism. UPP claims Dr. Chreky received a reprimand for the "worst chart" Dr. Wadas had ever seen. SAMF ¶61. Yet chart quality is inherently subjective. Dr. Flaherty described documentation standards as involving "a vast amount of variability." SAMF ¶63. Subjective rationales are more likely to mask discrimination. *See Goosby v. Johnson & Johnson*, 228 F.3d 313, 320-21 (3d Cir. 2000).

Dr. Flaherty – who supervised Dr. Chreky for nearly six months after she replaced Dr. Kumar – never observed a pattern of poor documentation. SAMF ¶64. UPP exaggerated a single, routine conversation into a post hoc justification. A jury could easily reject it.

### 5. The EKG Mistake Was Neither Unusual Nor Disqualifying

UPP's final reason – a misread EKG – does withstand scrutiny. Mistakes happen in emergency medicine. Dr. Flaherty admitted she had made medication errors herself, and said "we're all humans, so mistakes can happen." SAMF ¶67. The incident did not trigger peer review SAMF ¶70. Wadas was not even sure if it was referred. SAMF ¶65. Yet Dr. Flaherty testified that peer review is reserved for cases involving "real risk of significant patient harm."

SAMF ¶66. If this mistake were as serious as UPP now claims, it would have triggered immediate escalation under their own policies.

Nor did UPP follow its contractual obligations. Dr. Chreky's agreement required notice and an opportunity to cure any material deficiencies before termination. SAMF ¶68. Wadas admitted UPP gave no such notice. SAMF ¶69. UPP's failure to follow its own contractual requirement to provide notice and opportunity to cure reveals the truth: these were not real performance issues warranting termination. Employers do not skip their own protective procedures when they have legitimate concerns.

Most tellingly, UPP allowed Dr. Chreky to continue treating patients after the incident without warning, restriction, or further review. SAMF ¶70. If the error reflected a threat to patient safety, UPP would have removed him immediately. Instead, he kept practicing as usual under Dr. Flaherty, who later testified she observed no pattern of clinical errors. SAMF ¶40.

A jury could conclude that UPP treated the incident as minor at the time – or at least an acceptable mistake for an ER doctor, and that UPP later used this mistake as a pretext to get rid of Dr. Chreky.

Because the reasons that UPP proffers are littered with weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions, the Court should deny summary judgment.

### IV. UNDER FUENTES PRONG TWO, EVIDENCE THAT YOUNGER PHYSICIANS WERE TREATED MORE FAVORABLY – AND OLDER PHYSICIANS WERE SINGLED OUT – DEMONSTRATES PRETEXT.

Dr. Chreky also has ample evidence to satisfy the second prong of *Fuentes*. Under *Fuentes v. Perskie*, a plaintiff may establish pretext by showing that the employer has treated similarly situated individuals outside the protected class more favorably, or has discriminated

against other members of the same protected class. 32 F.3d 759, 765 (3d Cir. 1994). Dr. Chreky presents both forms of proof.

A. *The Physician Assistance Program: Younger Physicians Survive Older Physicians Do Not.*

The handling of UPP's Physician Assistance Program ("PAP") exposes a pattern of age-based disparities in outcomes. PAP is UPP's confidential rehabilitation pathway for physicians with behavioral concerns. According to Dr. Wadas, PAP is "designed to afford physicians an opportunity to consult with a behavioral health expert in a confidential, non-punitive way." SAMF ¶73. Dr. Wadas admitted that physicians who "entered PAP for a specific reason, completed it as requested and maintained the improvement" would "typically" be retained. SAMF ¶74.

That stated policy, however, was not applied evenly. The contrast between three PAP referrals – Dr. S., Dr. Chreky, and Dr. C. – tells the story. All three were referred for behavioral concerns. All completed PAP. But only the youngest, Dr. S. (age 43), was retained. SAMF ¶¶77-78.

Dr. S. admitted to using "racially offensive terms" in the workplace. SAMF ¶75. He completed PAP and kept his job. SAMF ¶77. By contrast, Dr. Chreky (age 71) and Dr. C. (age 67) were terminated within months of completing PAP. SAMF ¶78. Their alleged misconduct – interpersonal tension and disputed profanity – was objectively less serious than Dr. S.'s self-admitted racial slurs. Yet UPP retained Dr. S. and terminated the others.

Dr. Wadas attempted to distinguish Dr. S. by calling his conduct "an isolated incident that he had good insight into, acknowledged, and it never happened again." SAMF ¶80. But that rationale crumbles on comparison. Dr. Chreky and Dr. C. also completed PAP. SAMF ¶78. There

is no evidence of repeated misconduct by either. SAMF ¶81. And neither admitted wrongdoing. SAMF ¶82. The only material difference between them and Dr. S. was age.

This stark divergence – where older physicians were fired and the younger physician was retained – reveals the "inconsistencies" and "implausibilities" that *Fuentes* recognizes as indicia of pretext. 32 F.3d at 765. UPP's justification does not withstand scrutiny. When a 43-year-old keeps his job after racial slurs, and two older physicians are fired despite rehabilitation, the inference of age discrimination is cemented. UPP's decision to retain a 43-year-old who used racially offensive terms while terminating older physicians for far less serious conduct establishes that age, not behavior severity, drove their decisions.

### B. *Evidence Of Discrimination Against Others In His Protected Class*

Dr. Kumar's forced departure following her first negative review in 20 years exemplifies UPP's pattern of pushing out older physicians. Dr. Kumar's supposedly "voluntary" retirement provides compelling evidence of UPP's systematic displacement of older physicians. Under *Fuentes*, Dr. Kumar's treatment supports Dr. Chreky's claim, as evidence that the "employer has discriminated against other members of his protected class." 32 F.3d at 765. The documentary record flatly contradicts UPP's narrative and instead shows a clear pattern of pressuring older physicians to leave.

First, Dr. Kumar received her only negative performance evaluation ("requires improvement") after nearly two decades of excellent service. SAMF ¶83. The 2019 evaluation (SAMF ¶84) came precisely when Dr. Wadas began implementing his plan to "remove some dead wood." (SAMF ¶10). Though Dr. Kumar testified she was "planning to retire anyways" her immediate employment elsewhere – in a more substantial role – belies this claim: "I didn't retire. I ended up getting another job—now even a bigger job." SAMF ¶85.

The evaluation's timing and content reveal UPP's strategy. After receiving her first "requires improvement" rating, Dr. Kumar announced her mid-contract departure in December 2020, the same period when UPP decided to terminate Dr. Chreky. SAMF ¶86. Only after agreeing to leave did her final 2020 evaluation improve to "meets requirements," with language suggesting a negotiated departure: "She will be stepping down at the end of December and we thank her for her years of service." SAMF ¶87.

Dr. Kumar's reluctance to characterize her departure as forced is understandable. Having spent over 20 years at McKeesport, she likely found it difficult to admit that an institution she called "family" had discriminated against her. SAMF ¶88. Moreover, publicly alleging discrimination against one of Pittsburgh's largest healthcare employers could damage her professional prospects in the region's close-knit medical community. Her conflicted testimony, where she initially hesitated with "I don't know" before claiming her decision predated the review, reveals this tension. SAMF ¶89.

Under *Fuentes*, Dr. Kumar's treatment directly supports Dr. Chreky's claim as evidence of discrimination against other members of his protected class, which supports a finding of pretext. 32 F.3d at 765. Both older physicians with excellent long-term records suddenly received negative reviews, faced pressure to leave, and were replaced by substantially younger physicians. This pattern of treating older physicians worse than their younger counterparts provides compelling evidence that age, not performance, drove UPP's personnel decisions.

Lastly, UPP (with Dr. Wadas as the decisionmaker) also discarded another physician to hire a substantially younger physician. UPP replaced Dr. C. (67), the other physician who completed PAP, with a physician 15 years younger. SAMF ¶92. This age difference creates a *per se* inference of discrimination in the Third Circuit; as such, evidence of discrimination with Dr.

C. is evidence of pretext in Dr. Chreky's termination.[6] And, alarmingly, Dr. C. – on his way out – noted that he was just trying to survive until the end of his contract because he felt that UPP was setting him up. *Id.* As such, there is additional *Fuentes* evidence of discrimination against others in the same protected class. And the Court should find, for these additional reasons, that Dr. Chreky's removal was pretextual.

## **CONCLUSION**

The record here is clear: UPP targeted Dr. Chreky for removal not because of performance, but because of age. Its own emails reveal a plan to replace older physicians, its justifications shifted and unraveled under scrutiny, and its treatment of younger doctors stood in stark contrast. No reasonable court would grant a directed verdict on this record, and summary judgment must be denied so that a jury can decide what motivated Dr. Chreky's termination.

Dated: July 15, 2025

/s/ Andrew Lacy, Jr. Esq.
Andrew Lacy, Jr. Esq.
**THE LACY EMPLOYMENT**
**LAW FIRM LLC**
3675 Market Street, Suite 200
Philadelphia, PA 19104
(t) (412) 301-3908
andrew.lacy@labor-employment-law.com

*Counsel for Plaintiff*

---

[6] *See Bruno*, 882 F.2d at 765 (holding that a ten-year age difference was sufficient to support an inference of age discrimination) (emphasis added).

## **CERTIFICATE OF SERVICE**

Plaintiff certifies that the foregoing was served upon counsel listed via the Court's

electronic filing system:

Jennifer S. Park

jennifer.park@dentons.com

T. (412) 297-4900

Abigail Britton

abbie.britton@dentons.com

**DENTONS COHEN & GRIGSBY P.C.**

625 Liberty Avenue

Pittsburgh, PA 15222-3152

*Counsel for Defendant*

Dated: July 15, 2025

_/s/ Andrew Lacy, Jr. Esq._

Andrew Lacy, Jr. Esq.

**THE LACY EMPLOYMENT**
**LAW FIRM LLC**

3675 Market Street, Suite 200

Philadelphia, PA 19104

(t) (412) 301-3908

andrew.lacy@labor-employment-law.com

*Counsel for Plaintiff*