**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

EMILE CHREKY,                                )
                                             )
                    Plaintiff,               )
                                             )          2:23-cv-00856
v.                                           )
                                             )
UNIVERSITY OF PITTSBURGH                     )
PHYSICIANS,                                  )
                                             )
                    Defendant.               )

**OPINION**

**Mark R. Hornak, United States District Judge**

Plaintiff Dr. Emile Chreky ("Dr. Chreky," "Chreky," or "Plaintiff") filed this lawsuit against his former employer, University of Pittsburgh Physicians ("UPP" or "Defendant"), alleging unlawful age discrimination in his employment. His claim centers on Defendant's decision not to renew his employment contract as an emergency room physician at University of Pittsburgh Medical Center McKeesport ("UPMC McKeesport") in 2021. (ECF No. 65, ¶ 20). He claims that this decision was the result of unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. §§ 951–963 (West).[1] Although Plaintiff's Second Amended Complaint ("SAC") also included discrete claims of harassment and retaliation, the only remaining claim in the litigation is unlawful age discrimination in violation of the ADEA and the PHRA.[2]

---

[1] PHRA claims are considered coextensive with ADEA claims and are considered by the Court under the same substantive rules. *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

[2] After confirming with counsel at Oral Argument, the Court entered an Order on January 23, 2026, stipulating that the only remaining claim in this action is age discrimination under the ADEA and the PHRA based on Defendant's nonrenewal of Plaintiff's contract. (ECF No. 94; *see also* ECF No. 67, at 9 n.1 ("Plaintiff is not pursuing his hostile work environment or retaliation claims at this stage")).

Defendant filed a Motion for Summary Judgment on June 3, 2025. (Motion at ECF No. 63; Brief at ECF No. 64). Plaintiff filed a Response, (ECF No. 67), to which Defendant filed a Reply, (ECF No. 74). With their briefs, the parties filed concomitant statements of facts, as well as responses to each other's statements of facts. The Court will reference those filings throughout this Opinion, so they are listed as follows for clarity:

- Defendant's Statement of Facts, at ECF No. 65;
- Plaintiff's Statement of Facts, at ECF No. 70;
- Plaintiff's Response to Defendant's Statement of Facts, at ECF No. 71; and
- Defendant's Response to Plaintiff's Statement of Facts, at ECF No. 75.

Following those submissions, Plaintiff moved for leave to file a Sur-Reply, (ECF No. 76), which the Court granted, (ECF No. 79). Plaintiff filed a Sur-Reply, (ECF No. 80), to which Defendant subsequently filed a Sur-Response, (ECF No. 83). Oral Argument was held via videoconference on January 14, 2026. (ECF No. 90). Defendant's Motion for Summary Judgment is thus ripe for adjudication. For the reasons explicated below, the Court DENIES Defendant's Motion.

## I.     Factual Background

From 2017 through mid-2021,[3] Defendant employed Plaintiff as an emergency room physician at UPMC McKeesport. (ECF No. 74, at 6). Plaintiff was employed through successive one-year contracts. (ECF No. 67, at 3; ECF No. 71, ¶ 17). The employment contract was written

---

[3] There is some uncertainty in the record surrounding the length of Plaintiff's employment. Plaintiff testified that he began working at the McKeesport Hospital in or around 1991 or 1992, but that his employment by Defendant UPP began in 2017. (ECF No. 69-1, at 155:3-13). UPMC acquired the McKeesport Hospital in or around 1998. Plaintiff testified that he "was with UPMC for 25 years," (ECF No. 69-1, at 99:18), which would approximately line up with when UPMC acquired the McKeesport Hospital. But some of Plaintiff's filings suggest that the Court should consider Plaintiff's employment length to be much longer than the amount of time between 2017 and 2021. (See, e.g., ECF No. 12, ¶ 8 ("Dr. Chreky worked for UPMC McKeesport for nearly 25 years as a pillar of UPMC's McKeesport Hospital and had an exemplary record during his tenure."); ECF No. 70, at 1 ("These facts, drawn from depositions, documents, and other evidence, tell the story of what happened when UPP decided to terminate Dr. Chreky after 18 years of exemplary service.")). The ownership and employment structure of UPMC and UPP is not relevant to the disposition of the pending Motion. The Court infers that some other entity employed Chreky from 1998 to 2017 while he physically worked at the McKeesport Hospital location, and that, for purposes of adjudicating the pending Motion for Summary Judgment, the beginning of the employment relationship between UPP and Chreky was sometime in 2017. As explained below, the factual record relevant to the pending Motion really only begins in 2019.

such that it was automatically renewed unless the Plaintiff received written notice of non-renewal. (ECF No. 71, ¶ 17). On March 5, 2021, Defendant sent Plaintiff a letter serving as a written notice of non-renewal. (ECF No. 71, ¶ 20). The letter was signed by Dr. Donald M. Yealy in his capacity as Chair of Emergency Medicine. (*Id.*). Plaintiff's employment at UPMC McKeesport officially ended on June 30, 2021. (ECF No. 67, at 8). The rest of this section of the Opinion goes through the facts and events relevant to the pending action chronologically.[4]

### A.  Late 2019

For reasons not revealed to the Court, the record in the present action really only begins in late 2019 — other than offhand mentions by deponents about Chreky's employment with UPP prior to 2019, there is no record evidence about his performance in 2017 or 2018. As such, the Court will begin the recitation of the relevant factual history in late 2019, when Chreky received his 2019 Performance Review. In that Review, Dr. Rani Kumar — who served as Department Chair for the UPMC McKeesport Emergency Room ("ER" or "ED") and supervised Plaintiff until her (Kumar's) resignation in December 2020 — cautioned Chreky to maintain his on-duty accessibility via phone. "Accessibility to staff and APP's [Advanced Practice Providers; *sic*] is vital in the ED." (ECF No. 71, ¶ 51). Dr. Kumar noted that "[c]arrying a charged phone (spectra link) and letting the staff know of his work location was discussed" in the Review and that she would "continue to monitor [Chreky's] accessibility." (*Id.*).

### B.  July 2020

On July 26, 2020, Dr. Kumar sent Chreky an email notifying him that she had "heard complaints from your colleagues that you[] are leaving 45 minutes before your shift ends. Your

---

[4] Of course, this section does not purport to recount every relevant factual detail concerning the pending action. Rather, it attempts to construct a timeline of particularly salient events. And unless noted, the facts set out are either undisputed, or to the extent there is a variance in the positions of the parties, such are not material.

team complains that most of the days you are ready to check out early." (ECF No. 65, ¶ 27). Plaintiff does not dispute the contents of that email but does dispute that "he had a practice of leaving 45 minutes prior to the end of his shift." (ECF No. 71, ¶ 27).

### C.   October 2020

The record indicates that many of the incidents relevant to this litigation occurred in October, November, and December 2020. On October 4, 2020, an Advanced Practice Provider ("APP")[5] with the initials "T.H." submitted a written complaint to Assistant Administrator for UPP's Emergency Department Kristen Boeltz (née Corbett) describing an incident that allegedly occurred on September 22, 2020. On that day, the UPMC McKeesport ER was very busy, and Plaintiff allegedly had to leave the ER work area to change his surgical scrubs because he spilled soup on them. When he returned, he allegedly was upset that T.H. had contacted another physician, Dr. Kumar, about a problem in the ER, instead of just waiting for him (Dr. Chreky) to return from changing his scrubs. T.H. complained that Chreky raised his voice at T.H. when T.H. told Chreky that he had called Dr. Kumar. (ECF No. 71, ¶¶ 29–40). The parties refer to this incident as the "T.H. Complaint" or "Soup Incident."

Sometime around the Soup Incident, T.H. also complained that Chreky had made a false report of T.H. leaving early from T.H.'s duty shifts on September 26 and 27. (ECF No. 71, ¶ 44). Defendant refers to this incident as the "Time Theft Claim." Senior Human Resources Director Heather Reading testified in her deposition that when ED leadership investigated Chreky's assertion that T.H. had left duty early, they found that T.H. had not left early. (ECF No. 71, ¶¶ 44– 45). Chreky disputes that the report of T.H. leaving early was "false," and he testified in his deposition that T.H. "leaves one hour earlier." (ECF No. 71, ¶ 46; ECF No. 69-1, at 83:18-25).

---

[5] APPs are non-physician professional health care providers working in EDs, typically nurse practitioners or physician assistants ("PAs").

Chreky also testified that he complained about T.H. because he believed T.H. had complained about him first. (ECF No. 71, ¶ 46; ECF No. 69-1, at 75:13-17).

Later in October, Dr. Richard Wadas — then the Executive Vice Chair of the Community Division of UPP Emergency Medicine, in charge of overseeing ED operations at various UPMC community hospitals including UPMC McKeesport — received a report from a Physician's Assistant, J.S., concerning Chreky. The report said that Chreky had left 45 minutes early from a shift, which resulted in J.S. being left alone with a heart attack patient in the ER. (ECF No. 71, ¶ 49). The report also alleged that Chreky left the McKeesport ER for varying periods of time, avoided seeing patients, and would not see "GYN complaints."[6] (ECF No. 71, ¶ 50). Plaintiff has not disputed that Dr. Wadas stated that Chreky would not see GYN patients. At Oral Argument, his counsel stated that he disputed leaving work early and did not address the report regarding GYN patients. Chreky has not in his filings specifically controverted the substance of that report by J.S., (*see* ECF No. 71, ¶ 50), so those matters are therefore not disputed for these purposes, *see* LCvR 56(E).

### D.  November 2020

Sometime in November 2020, Dr. Paul Kim — an approximately 34-year-old[7] physician who Chreky alleges was hired to replace him — visited the UPMC McKeesport ER. (ECF 70, ¶ 14). Dr. Kim was an ER resident within UPMC from 2018 through 2021. (ECF No. 71, ¶ 148). In

---

[6] Both parties reference the claim that Chreky would not see "GYN complaints" in their filings. (*See* ECF No. 64, at 8, 16; ECF No. 65, ¶ 50; ECF No. 71, ¶ 50; ECF No. 74, at 3; ECF No. 75, at 27). On the Court's review, the parties neither define nor discuss this term in any of the instances in which they use it. The Court infers that "GYN complaints" refers to women who presented in the ED with exigent gynecological concerns. At least based on the extent to which the topic was discussed in the briefing, it appears that neither party attributed much significance to this claim. The Court notes, however, that a reasonable jury might consider such a claim to be an important data point regarding Chreky's professional conduct.

[7] In Plaintiff's filings, Dr. Kim is listed as being 30 years old in some instances and 34 years old in others. (*See, e.g.*, ECF No. 70, at 2, 5). According to Defendant's Statement of Facts, Dr. Kim's year of birth is 1987. (ECF No. 65, ¶ 154). That would put him at approximately 33 or 34 years old during the relevant period.

or around November 2020, Dr. Flaherty accepted the Department Chair role, which was previously occupied by Dr. Kumar. (ECF No. 71, ¶ 143).

On November 9, 2020, Dr. Wadas wrote in an email to another doctor: "Between you and I, I don't think Chreky is long for our world. Interpersonal skills aside, clinical concerns are growing." He also noted that UPP needed "new boots on the ground." (ECF No. 70, ¶ 9).

On November 19, 2020, Dr. Wadas was notified that C.R., a hospitalist at UPMC McKeesport, submitted a complaint about Chreky having cursed at C.R., and that complaint stated the following:

> I asked if [Dr. Chreky] could speak with neurosurgery prior to me accepting for admission as to the appropriateness of the admission to McKeesport given the nature of her very recent medical history and need for neurosurgery given her right upper and lower extremity numbness and gait dysfunction to which he stated "you can consult them yourself." I reiterated that I did not want to accept the patient until I knew we could appropriately care for her by way of a neurosurgical clearance...I felt a page to the primary neurosurgical team of Dr. Zinn (the attending for Shadyside's neurosurgical team on this patient's case) would be imperative to ensure he felt the patient would be safe at our facility given her active neurologic impairment. To my request of consulting Dr. Zinn, Dr. Chreky snapped towards me saying, "you're not gonna tell me what to do fucker. I don't have time for this."

(ECF No. 71, ¶ 54). Plaintiff disputes the facts within that complaint, and also argues that the complaint constitutes inadmissible hearsay evidence that cannot be considered in support of a motion for summary judgment.[8] (*Id.*).

Also on November 19, Dr. Wadas wrote in an email to another doctor the following: "While I know [Chreky] will never change, he is consistently getting worse in the last year . . . Plan for MCK -- new leadership, remove some dead wood, improve every aspect of it." In that

---

[8] This Court recently considered whether, at the summary judgment stage, the Court can consider such employee complaints (even anonymous ones) or whether they are barred as inadmissible hearsay. The Court determined that it can consider such complaints in the disposition of a summary judgment motion, even if the admission of the statements would be contested at trial on other evidentiary grounds. *See Albert v. Allegheny Health Network*, No. 2:21-CV-01625, 2026 WL 234009, at *19 (W.D. Pa. Jan. 29, 2026).

email, Wadas also stated, "He [Chreky] is gone in June. We will notify him in February." (ECF No. 70, ¶ 11–12).

The next day, Chreky said in an email to Dr. Kumar that he did "not remember any time INSULTING HIM [C.R.]. I have NEITHER insulted another colleague OR any other physician or any other nursing staff all the time I have been working. I HAVE ALWAYS been respectful to everyone working with me." (ECF No. 71, ¶ 64). On November 21, 2020, Dr. Kumar sent Chreky an email that stated:

> As per our discussion last night I feel the need to give you clarity on the following issues: a. Disagreement in a treatment plan, amongst providers in [sic] not uncommon, but professionalism is always expected. b. Use of harsh language and inappropriate behavior is not tolerated in the work environment. c. I expect you to call the APP with whom you had the interaction and apologize on your behavior and choice of words. d. UPMC policy on the mutual respect/professional ethics and behavior is accessible on the UPMC intranet. Please review that for your future education. I hope that I will not need to remind you of the expectations of your behavior at workplace. Please be aware that Dr. Wadas and HR will be contacting you for further discussions. This is a serious event. I hope that you will make sure that such incidents do not become a trend. Let me know if you need any professional assistance in the matter.

(ECF No. 71, ¶ 63). It should be noted, however, that there is some evidence in the record that the alleged confrontation was not as hostile as the complaint made it sound. One hospital staff member ("P.R.") wrote an email to Dr. Kumar stating "that she was sitting about 8 feet away from Dr. Chreky when he had a phone conversation with a hospitalist about a patient, and [that] . . . '[a]t no time was Dr. Chreky disrespectful, unprofessional, or vulgar.'" (ECF No. 71, ¶ 67).

### E. December 2020

On December 1, 2020, Dr. Wadas sent Chreky a letter requiring him to contact the Physician Assistance Program ("PAP"). (ECF No. 66-7; ECF No. 71, ¶¶ 70–71). His referral to PAP, according to the letter, was due to him "swearing and speaking in a loud tone of voice with one of the PAs." (ECF No. 65, ¶ 73). A week later, Chreky met with Dr. Kumar to receive his

performance review for 2020. Chreky received a "Requires Improvement" review. The review stated the following:

> This year has been however challenging for Dr. Chreky. He has had confrontation with the APP and with the inpatient team requiring administrative intervention and HR involvement. Opportunity to enhance his communicative skills and his relationship with colleagues aligned with the UPMC values was discussed with him and he is eager to work on it in the coming year.

(ECF No. 71, ¶¶ 79–81).

Dr. Kumar sent the performance review to Dr. Radomski, who forwarded it to Dr. Wadas, Russell Meyers, and Kristen Corbett — the latter two of whom were UPP administrators. (ECF No. 65, ¶ 29; ECF No. 70, at 3). In Dr. Radomski's email, he stated, "This [Chreky's performance review] may be too positive if we are looking to renew him…" He followed up by "replying-all" 6 minutes later, seemingly to correct a misstatement in the previous email, saying, "Ugh…looking to NOT renew him." With that correction, the full statement would read, "This may be too positive if we are looking to NOT renew him." Russell Meyers replied to the group, asking, "Does he really make 'good, safe clinical decisions'?" Kristen Corbett responded, on December 9, 2020, saying, "My thoughts exactly. I think that first part needs tweaked." (ECF No. 69-11, at 2). Dr. Wadas replied to the email chain concerning Chreky's 2020 performance review, saying, "I'm not sure we can change what Kumar wrote but can certainly add that we have had some clinical concerns raised by the nursing staff and the hospitalists." (ECF No. 69-11, at 2).

The next day, on December 10, 2020, Dr. Wadas emailed Chreky asking why he administered a contraindicated drug to a patient. Chreky emailed back, admitting that he administered the drug because he initially thought the patient had an overly *fast* heart rate and only later realized that the patient had bradycardia, a condition instead characterized by a *slowed* heart rate. (ECF No. 71, ¶¶ 83–89). Dr. Wadas did not believe that Chreky took this situation as seriously

as he should have. (*Id.*). The parties and the Court refer to this incident as the "Wrong Medication Incident."

That same day, Dr. Wadas emailed Heather Reading — Senior Human Resources Director at UPP — cc-ing Kristen Corbett, copying and pasting Chreky's response to the Dr. Wadas's inquiry about the Wrong Medication Incident. Dr. Wadas noted that "This was a deviation form [*sic*] the level of care we would expect." He goes on to state, "Would you recommend doing anything additional with this information at this time? It is still our plan to non-renew this physician." Heather Reading replied asking, "Would you take any formal action if another physician would have this type of oversight?" to which Wadas replied, "I think a letter/email" and noted that this is "the first formal care related complaint [he] received directly." Heather Reading responded recommending that Wadas proceed with the letter or email, noting that she did not know if "this would raise to a level that we'd issue a notice to cure but if there is a repeat event we might get there ahead of the non-renewal discussion." (ECF No. 69-12).

On December 15, 2020, Dr. Wadas emailed Dr. Kim — the 34-year-old physician who toured UPMC McKeesport that prior November — offering him a full-time position starting July 1, 2021. The offer email notes that the annual base salary of $375,174 would be for "750 ED hours/year at UPMC McKeesport and 750 ED hours/year at Mon Valley." The email is signed by Dr. Wadas and Dr. Yealy. (ECF No. 69-10, at 2–3).

The so-called "Worst Patient Chart Incident" occurred on December 19, 2020, when a UPMC quality reviewer forwarded a patient chart completed by Chreky to Dr. Wadas. Dr. Wadas emailed Chreky asking him to explain the chart, saying:

> Please review this chart. The dictation is so poor and without any evidence of proofreading, I struggle to understand much of what occurred in the case. Additionally, all of the historical elements are missing. You marked that you agree with the past, family, and social history, yet nothing is documented. If he was

unable to provide any history, that should be documented. The chart is grossly incomplete and in some areas unintelligible. There are no vs, no interpretation of any of the diagnostic studies, and the exam is scant. Did you really test his gait and find it to be normal? Please explain.

Chreky responded saying, "i am sorry i was very busy on that day" [*sic*] and "[r]egarding the gait it must have been inadvertently clicked." (ECF No. 71, ¶¶ 95, 98).

Although Chreky worked in the UPMC McKeesport ED through the end of June 2021, it does not appear that any additional incidents concerning Chreky's professional conduct were documented after December 2020. (ECF No. 70, ¶ 38–39).

### F.  January 2021

On January 1, 2021, Dr. Sarah Flaherty began in her new role as Site Chief of the UPMC McKeesport ER. Dr. Flaherty testified that, in that role, she received "frequent" reports about Chreky "not coming to the ER to see patients or retreating to the break room and being unavailable for consultation." (ECF No. 71, ¶ 107–109).

Sometime in early 2021, Chreky completed the PAP program. (ECF No. 71, ¶ 74).

### G.  March 5, 2021

Chreky is notified by letter on March 5, 2021, that his contract with UPP was not being renewed. The letter was signed by Dr. Yealy. (ECF No. 66-8, at 31; ECF No. 70, ¶ 31).

### H.  April 2021

On April 12, 2021, an email exchange occurred between Dr. Flaherty, Dr. Wadas, and Dr. Radomski, with the subject line "Random opinion question." (ECF No. 69-13). Dr. Flaherty asked the other two if it was okay, at a staff meeting, to say something along the lines of "with the retirement of Dr. Chreky," or if she should say "departure" instead, or if she should not "say anything at all and just sort of leave it as the unspoken elephant in the room." Flaherty noted that she knew "Chreky [was] not going quietly." (*Id.*).

10

Dr. Radomski replied-all to that email, advising not to call it retirement, and, "if anything," to say "departure." Dr. Flaherty replied-all, saying, "Okay thanks . . . Everyone sort of knows for the most part, but no real announcement has been made so to speak and I hate the whispers lol. I wish he [was] just leaving with some degree of grace and we could treat it as retirement and 'thank' him for all his service. . . instead it is just super awkward." (*Id.*).

### I.   June 30, 2021

Chreky's last day employed by UPP was June 30, 2021. (ECF No. 70, ¶ 32).

### J.   July 1, 2021

Dr. Kim's first day employed by UPP was July 1, 2021. For the first six months of his employment, Dr. Kim split his time between the McKeesport ER and the Mon Valley ER. (ECF No. 70, ¶¶ 32–33).

### K.   January 2022

In January 2022, Dr. Kim began working all contracted clinical hours at UPMC McKeesport, no longer splitting between McKeesport and Mon Valley. (ECF No. 70, ¶ 35).

## II.   Legal Standard

The Motion before the Court is a wall-to-wall Motion for Summary Judgment by the Defendant. (ECF No. 63). In other words, if the Court were to grant Defendant's Motion, Plaintiff's entire case would be dismissed.

At summary judgment, the Court must consider whether a reasonable jury could find in favor of the nonmoving party. "[S]ummary judgment is appropriate only where there is no issue of material fact and judgment is appropriate as a matter of law" based on the record as it stands. *Prather v. Prudential Fox & Roach*, 326 F. App'x 670, 672 (3d Cir. 2009). The burden is on the moving party to show that there is no genuine issue as to any material fact. "[S]ummary judgment

is to be entered if the evidence is such that a reasonable fact finder could find only for the moving party." *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000). If the nonmoving party bears the burden of proof on a claim yet fails to establish an element that is essential to that claim, summary judgment must be entered for the moving party. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Of course, in making the determination of whether to grant summary judgment, the Court must "view the record in the light most favorable to [the nonmoving party] and resolve all reasonable inferences in his favor." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999).

## III.    Discussion

The Court has carefully reviewed the evidence on the record, the parties' detailed briefing, and counsels' thorough and excellent presentations during Oral Argument. The Court concludes, based on that review, that summary judgment is not appropriate in this matter because the Court concludes that a reasonable jury could conclude that Defendant's proffered reasons for terminating Plaintiff's service in the McKeesport ED were pretext for unlawful age-based discrimination. The disposition of this Motion comes down to the third and final step in the *McDonnell Douglas* burden-shifting analysis, at which it is the plaintiff's burden to show by a preponderance of the evidence that the employer's proffered reasons for the adverse employment action were pretextual. *See McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

### A.   *McDonell Douglas* Burden-Shifting Framework in ADEA Cases

The Age Discrimination in Employment Act ("ADEA") prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The *McDonnell Douglas* burden-shifting framework applies in ADEA

cases, *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997), and the plaintiff must show by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action to succeed on an ADEA claim, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

Under *McDonnell Douglas*, the plaintiff must establish a prima facie case for age discrimination, and at the summary judgment stage, the record evidence must support the establishment of that prima facie case. The prima facie case for age discrimination consists of four elements: (1) that the plaintiff is at least forty years of age; (2) that the plaintiff suffered an adverse employment decision; (3) that the plaintiff was qualified for the position at issue; and (4) that the plaintiff was replaced by an employee who was sufficiently younger so as to support an inference of a discriminatory motive, or, in the alternative, that there is other evidence of record that would support a finding of discriminatory motive. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

The burden is on the employer at the second step in *McDonnell Douglas* framework. After the prima facie case has been established, the employer must "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Jones*, 198 F.3d at 412. Such a reason, "if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994). The Third Circuit has noted that this second step is a "relatively light" burden. *Id.* The employer's burden at this step is one of production, not persuasion; the ultimate burden of persuasion rests with the plaintiff. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). "If the defendant has failed to sustain its burden but reasonable minds could differ as to whether a preponderance of the

evidence establishes the facts of a prima facie case, then a question of fact does remain, which the trier of fact will be called upon to answer." *Id.*

At step three of *McDonell Douglas*, the plaintiff bears the burden to show, by a preponderance of the evidence, that the employer's proffered reason for the adverse employment action was pretextual. There are two ways that a plaintiff can show that an employer's reason was pretextual. *Klastow v. Newtown Friends Sch.*, 515 F. App'x 130, 133 (3d Cir. 2013). The first involves the presentation of record evidence that casts doubt on the employer's proffered reasons. The evidence must not "simply show that the employer's decision was wrong or mistaken . . . . [r]ather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes,* 32 F.3d at 765 (citations omitted).

The second way to establish pretext is "to point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015). There are three main categories of evidence that are relevant here: evidence that "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." *Id.* The plaintiff can "defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse

employment action." *Fuentes*, 32 F.3d at 764 (emphasis in original). A plaintiff need not show both.

### B. Plaintiff's Prima Facie Case

As stated above, a prima facie case for age discrimination is established by showing the following four elements: (1) that the plaintiff is at least forty years of age; (2) that the plaintiff suffered an adverse employment decision; (3) that the plaintiff was qualified for the position at issue; and (4) that the plaintiff was replaced by an employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Burton*, 707 F.3d at 426. In the instant case, the record before the Court demonstrates that Chreky has established a prima facie case.

The first and third elements do not appear to be in dispute here. Plaintiff was age 70 and 71 when the incidents that gave rise to this litigation occurred. And Defendant does not appear to contest that Chreky was qualified by virtue of his education, training, and certification for the position he held. (*See* ECF No. 66-8, at 45–47). The first and fourth elements of the prima facie case *are* in dispute. Defendant argues that nonrenewal of Chreky's contract was not an adverse employment decision and that Plaintiff cannot show that he was replaced by a sufficiently younger employee so as to support an inference of discrimination. (ECF No. 64, at 10–14).

In this Circuit, nonrenewal of an employment contract is an adverse employment decision. In *Wilkerson v. New Media Technical Charter School*, the Third Circuit stated that "[t]he failure to renew an employment arrangement, whether at-will or for a limited period of time, is an employment action, and an employer violates [antidiscrimination law] if it takes an adverse employment action for a reason prohibited by [antidiscrimination law]." 522 F.3d 315, 320 (3d Cir. 2008). In the years since that case, our sister courts have noted that the "argument has already been rejected by the Third Circuit" that nonrenewal of an annual employment contract does not

constitute an adverse employment action. *Golembeski v. Moorestown Twp. Pub. Sch.*, No. CIV. 11-02784 RBK/JS, 2013 WL 1007672, at *4 (D.N.J. Mar. 13, 2013). Just last year, the Third Circuit affirmed that nonrenewal of an employee's contract was an adverse employment action, reversing in part a district court's grant of summary judgment to a defendant. *Sorokina v. Coll. of New Jersey*, No. 24-1365, 2025 WL 1289148, at *7 (3d Cir. May 5, 2025).

Plaintiff in the present case had an annual employment contract with Defendant, UPP. (*See* ECF No. 66-8, at 32–41). The initial employment contract between the parties began on July 1, 2017, and lasted for a period of twelve months, or one "Contract Year." (ECF No. 66-8, at 36). The contract stipulated that it would "automatically renew for successive one-year periods," (*id.*), which occurred in 2018, 2019, and 2020, (ECF No. 71, ¶ 19). On March 5, 2021, UPP notified the Plaintiff that his contract would not renew for the twelve months from July 2021 through July 2022. (ECF No. 66-8, at 31). Defendant asserts that because Chreky's contract allowed him to be nonrenewed "under any conditions" or "for any or no reason, . . . [n]o adverse employment action occurred." (ECF No. 64, at 11). But that assessment by Defendant does not cite any legal authority and sidesteps the law in this Circuit that nonrenewal of an employment contract constitutes an adverse employment action. As such, the Court accepts, as a factual matter, that Chreky was issued a nonrenewal letter and that, as a legal matter, his nonrenewal by UPP was an adverse employment decision for purposes of *McDonnell Douglas*.

Next, Plaintiff asserts that the hiring of Dr. Paul Kim, whose contract with UPP to provide ED services at UPMC McKeesport began the day after Plaintiff's last day of employment, establishes the fourth element of his prima facie case of age discrimination. (ECF No. 67, at 10). The Defendant asserts that the Plaintiff cannot establish the fourth element of the *McDonnell Douglas* analysis because "there are no facts to support" the Plaintiff's theory that "Dr. Paul Kim

was hired to replace him *because* of his age." (ECF No. 64, at 11 (emphasis added)). UPP also argues that Dr. Kim did not replace Chreky because their job duties were different. Regarding its first argument, Defendant again misapplies the law concerning *McDonnell Douglas*. The Third Circuit has specifically held that whether a replacement employee is significantly younger than a replaced employee in an ADEA *McDonnell Douglas* analysis is usually a factual question, not a legal one. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021). In other words, the plaintiff need not show at this stage that the replacement employee was chosen *because* of his age. Rather, the fourth element of the prima facie case is simply *whether* the employee "was replaced by a significantly younger employee." *Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 240 (3d Cir. 2011). The record reflects that Dr. Kim — approximately 34 years old at the relevant time — was significantly younger than the Plaintiff. This age differential is sufficient for this stage of the analysis.

Defendant also argues that Dr. Kim did not *replace* Chreky because Dr. Kim was hired to split his time between UPMC McKeesport and UPMC Mon Valley, whereas Chreky worked only at UPMC McKeesport. (ECF No. 64, at 12). This argument is similarly unsuccessful, at least for these purposes. First, Dr. Kim shifted over to full-time work at UPMC McKeesport within six months of the start of his employment, which had at the outset included service in the UPMC McKeesport ED. Further, the Third Circuit has cautioned lower courts that "[n]ot all of a plaintiff's duties have to go to a single replacement; the replacement's job does not have to match the plaintiff's job exactly" to establish the fourth element of the prima facie case. *Martinez*, 986 F.3d at 267. The timeline also weighs against Defendant's argument. On December 10, 2020, Dr. Wadas expressed via email that it was the "plan to non-renew" Chreky; on December 15, 2020, Dr. Wadas emailed Dr. Kim offering him employment. (ECF No. 69-10, at 2–3). Chreky's final day employed

by UPP was June 30, 2021; Dr. Kim's first day was the next day, July 1, 2021. (ECF No. 67, at 11). The age differential between Drs. Chreky and Kim, their approximately equivalent job duties, and their respective nonrenewal and hiring timelines establish the fourth element of Plaintiff's prima facie case, at least for purposes of the summary judgment analysis. At trial, the parties may end up litigating whether Dr. Kim indeed *replaced* Chreky, but, at present, the record — viewed in the light most favorable to Plaintiff — would support a conclusion that he did. That means that the summary judgment analysis marches on.

For the above reasons, the Court concludes — for purposes of ruling on the pending Motion — that Plaintiff has established a prima facie case for age discrimination. The next step of the *McDonnell Douglas* analysis is to consider whether the employer has satisfied its modest burden of production to offer a legitimate, nondiscriminatory reason for the adverse employment action.

### C. Defendant's Proffered Reason for Nonrenewal

Defendant proffers that its decision to not renew Plaintiff's employment contract was based on Plaintiff's professional misconduct. As noted above, this is a relatively light burden to carry for the employer. So long as "the defendant presents evidence of a nondiscriminatory reason, the burden shifts back to the plaintiff to show that the employer's proffered justification for the adverse action is pretextual." *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 384 (E.D. Pa. 2013) (quotations omitted). The Court concludes that UPP has easily satisfied that burden by asserting — and providing record evidence that would allow a factfinder to conclude — that there were nondiscriminatory business reasons for the nonrenewal of the Plaintiff's contract, including "a pattern of interpersonal and clinical issues occurring in 2020." (ECF No. 64, at 13).

In particular, Defendant points to five key incidents concerning Plaintiff's workplace behavior, some of which Plaintiff does not dispute. First, UPP asserts that there were multiple

instances in which Chreky allegedly left his shifts early. On one day, that allegedly resulted in a PA being left alone to care for a heart attack patient. (ECF No. 64, at 7–8). Second, UPP asserts that two employees submitted complaints about Chreky being confrontational and using inappropriate language toward them. (ECF No. 64, at 8–9). Third, UPP points to Chreky's 2020 performance review, which noted that he "required improvement." (ECF No. 64, at 9). Fourth, UPP asserts that on December 10, 2020, just two days after he was given his performance review, Chreky gave a cardiac patient a contraindicated drug that compromised the patient's safety. (*Id.*). And finally, on December 19, 2020, a quality reviewer noted that a patient chart completed by Chreky was "one of the worst charts that he had ever seen." (*Id.*).

Defendant emphasizes that Chreky does not dispute that various staff members actually submitted complaints about him, including for his treatment of staff, leaving early, and not seeing certain patients. (*See* ECF No. 71, ¶¶ 29, 49). Chreky does dispute the factual allegations in the underlying complaints — he just does not dispute that the complaints were made. Defendant asserted that "there is no dispute of fact that the Wrong Medication Incident and the Worst Patient Chart Incident had actually occurred and that they occurred shortly after Chreky met with Dr. Kumar to discuss his 2020 Performance Evaluation on December 8, 2020." (ECF No. 74, at 4). But at Oral Argument, the Court asked Plaintiff's Counsel to clarify what incidents Plaintiff disputes. Counsel stated that Plaintiff does dispute the following: the "terrible chart" (in that the Plaintiff disputes it was so terrible); being gone when a patient had a heart attack; that the Plaintiff was inaccessible; and that the Plaintiff would leave work early. Plaintiff does *not* dispute administering the wrong medication to a patient (the "Wrong Medication Incident").

Ultimately, whether Plaintiff disputes the facts underlying these incidents is irrelevant to the Court's analysis at the second prong of *McDonnell Douglas*. That is because the only question

at this point in the analysis is whether there was some legitimate reason — *any* reason, other than unlawful discrimination — that UPP would have cause to fire Chreky. The information in the record reveals that UPP's proffered reasons for not renewing Chreky's contract are more than sufficient to meet the second prong of the *McDonnell Douglas* analysis. A factfinder could readily conclude that Defendant acted well within its rights, and the law, in not renewing Chreky's employment contract based on his professional behavior.

The burden accordingly shifts back to Plaintiff to show that the reasons offered by Defendant are pretextual. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir.1989) ("Summary judgment is inappropriate, however, if the plaintiff . . . counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge."). And, as is often the case, this is where the rubber meets the road in resolving the pending Motion.

### D.  Plaintiff's Claim of Pretext

A plaintiff can defeat summary judgment "by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764; *see also Klastow*, 515 F. App'x at 133 (invoking *Fuentes* framework for establishing pretext in ADEA cases). Evidence of discriminatory pretext can be either direct or circumstantial. Direct evidence is "evidence that the decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." *Gutknecht v. SmithKline Beecham Clinical Lab'ys, Inc.*, 950 F. Supp. 667, 670 (E.D. Pa. 1996), *aff'd*, 135 F.3d 764 (3d Cir. 1997) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). Alternatively, a plaintiff can present circumstantial evidence consisting of

"inconsistencies or implausibilities that support an inference that defendant did not act for its stated reasons." *Id.* at 671.

A plaintiff cannot survive a summary judgment motion simply by showing that the employer was wrong or mistaken in making the adverse employment decision. Instead, the plaintiff must "present evidence contradicting the *core facts* put forward by the employer as the legitimate reason for its decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quotations omitted) (emphasis in original). As was discussed at Oral Argument, under ADEA, a plaintiff must prove that age was the "but-for" cause of the employer's adverse employment decision — not simply a motivating factor in the decision, as is the case under other fair employment practices statutes. *Gross v. FBL Financial Services*, 557 U.S. 167, 176 (2009). In other words, age must have had a "determinative influence" on the employer's decision. *Id.*

Importantly, though, the standard for granting summary judgment is not whether the plaintiff has definitively proven that the but-for cause of the adverse employment action was age-based discrimination; rather, it is whether the plaintiff has presented evidence from which *a reasonable jury* could determine that the but-for cause of the employer's adverse employment action was age-based discrimination. *See, e.g.*, *Byron v. Columbia Gas of Pennsylvania*, No. 22-3408, 2023 WL 8663876, at *2 (3d Cir. Dec. 15, 2023).

District courts must "review[] the record in its entirety" rather than "pars[e] each issue" at this stage of the analysis. *Snooks v. Duquesne Light Co.*, 314 F. App'x 499, 505 (3d Cir. 2009). In other words, the Court must consider "*all* of [the plaintiff's] arguments together as a whole" to determine whether a reasonable factfinder could find that the employer did not make its decision based on its proffered reason. *Id.* Accordingly, the Court will consider the combination of evidence presented by Chreky that allegedly "casts sufficient doubt" on UPP's proffered reason for

nonrenewal and that could "allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause" of nonrenewal. *Fuentes*, 32 F.3d at 762.

Because facts must be viewed in the light most favorable to the non-moving party at the summary judgment stage, the Court must accept for these purposes Plaintiff's assertion that the decision not to renew Chreky's contract was made as of November 19, 2020, when Dr. Wadas — one of the central decisionmakers on such matters — wrote an email stating that Chreky "is gone in June. We will notify him in February." (ECF No. 70, ¶ 11–12). A jury may — but is not required to — conclude that the die was cast as to nonrenewal at the time of that email. And that email occurred before Chreky was referred to PAP (on December 1, 2020); before Chreky met with Dr. Kumar to receive his annual performance review (on December 8, 2020); before the Wrong Medication Incident (December 10, 2020); and before the Worst Patient Chart Incident (December 19, 2020).

### i.    *First Method of Proving Pretext*

The first way to establish pretext "is for the plaintiff to point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action." *Willis*, 808 F.3d at 644.

In this Circuit, comments by decision-makers suggesting age-related animus have, in some instances, been sufficient to defeat summary judgment. To determine whether a statement presents evidence of discriminatory animus, courts are directed to assess "whether the speaker was a decisionmaker, the content of the statement and whether the statement was related to the decisional process." *Kargbo v. Philadelphia Corp. for Aging*, 16 F. Supp. 3d 512, 524 (E.D. Pa. 2014) (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir. 1994)). Stray remarks do not suffice, especially if made significantly before an employment decision is made. *Id.* at 523–24. But

statements that are "directly related to the plaintiff's job and [are] made by a decisionmaker a few months before" an adverse employment decision can constitute evidence of age-related animus. *Id.* at 524.

Some case law examples may help to buff off this otherwise fuzzy concept. In *Fakete v. Aetna, Inc.*, the Third Circuit determined that a supervisor's statements that he was "looking for younger single people" and that the plaintiff would not "be happy [at the workplace] in the future" were sufficient to show that "age was more likely than not a substantial factor in [that supervisor's] decision to fire [the plaintiff]." 308 F.3d 335, 339 (3d Cir. 2002). In *Karbago v. Philadelphia Corp. for Aging*, the District Court for the Eastern District of Pennsylvania held that a supervisor's comments to a plaintiff — which included but were not limited to that the supervisor did not believe the plaintiff was "the right man for this job" because the plaintiff was "52 years old" and "[t]his job is normally for young college graduates" — constituted evidence of age-based animus. 16 F. Supp. 3d at 518. Such statements were not simply stray remarks because they "were made by a decisionmaker in a serious context." *Id.* at 525.

In contrast, the District Court for the Eastern District of Pennsylvania determined that the plaintiff had "not pointed to *any* contradiction in the 'core facts' that undergird the employer's proffered reasons" for its adverse decision regarding the plaintiff when the plaintiff's evidence consisted of: (i) the fact that executives included the ages of potential candidates to succeed the president of the corporation; (ii) the termination of a 35-year old employee after a supervisor stated that he was "'not sure about [the thirty-five-year-old employee's] long-term potential; [he] needs more direct supervision'"; and (iii) a "list of employee names and ages [a supervisor] crafted . . . before he became CEO." *McGrath v. Lumbermens Merch. Corp.*, 851 F. Supp. 2d 855, 861–63 (E.D. Pa. 2012).

In attempting to prove pretext via the first method, Plaintiff to an extent relies on what he says is direct evidence of age-based animus by decision-makers as indicated by allegedly age-related comments; the timeline of the replacement of Chreky by Dr. Kim; and that Defendant's reasons for nonrenewal allegedly evolved over time.

Plaintiff alleges decision-makers at UPP made three categories of age-related comments: (1) mortality-based comments suggesting Chreky was too old (*i.e.*, he is "not long for our world"); (2) derogatory stereotypes about older workers (*i.e.*, "dead wood," "will never change"); and (3) explicit declarations of his termination plan (*i.e.*, "He is gone in June"). (ECF No 67, at 12). These comments were contemporaneous to UPP decisionmakers considering whether to renew Chreky's contract.

Chreky also claims that Defendant "engineered a false paper trail to justify replacing an older physician with a younger one." (ECF No. 67, at 17). Plaintiff reiterated this claim during Oral Argument, asserting that the cluster of events that constituted cause for Chreky's nonrenewal all curiously occurred within less than six months. Further, Plaintiff asserts that the timeline belies Defendant's contention that the Wrong Medication Incident and the Worst Patient Chart Incident were integral to the nonrenewal decision. He points to the fact that Dr. Wadas's emails from November 19, 2020, and December 10, 2020, state that Chreky would not be renewed, but the Wrong Medication Incident occurred on December 10, 2020, and Dr. Wadas found out about the Worst Patient Chart Incident on December 19, 2020.

Plaintiff argues that UPP's allegedly evolving rationales for nonrenewal of Chreky's contract would allow a factfinder to infer discriminatory intent because "inconsistencies" and "contradictions" in an employer's story are probative of pretext. *Fuentes*, 32 F.3d at 765. In support of the changing rationales claim, Plaintiff cites his testimony in which he said that he was initially

told he was being nonrenewed because UPP was eliminating his position due to "restructuring." (ECF No. 67, at 18). Later, however, UPP claimed the nonrenewal was due to Chreky's misconduct. *Id.* Subsequently, Plaintiff asserts that UPP added two additional reasons for the nonrenewal decision — both of which were in line with its previously-provided reasons for nonrenewal on the basis of professional misconduct. Those additional reasons included that Chreky left a heart attack patient in the care of a PA and that the quality of his patient chart documentation was poor. *Id.*

Defendant points out in briefing that "[s]eemingly age-related comments, such as 'dead wood,' 'retired in place,' etc., are not evidence of direct discrimination without any supplemental evidence to suggest these terms were used to denote age." (ECF No. 74, at 10 n.30). In support of this proposition, Defendant cites various cases in its briefing. *See, e.g.*, *EEOC v. Clay Indus.*, 955 F.2d 936, 942 (4th Cir. 1992); *Wado v. Xerox Corp.*, 991 F. Supp. 174, 202 (W.D.N.Y. 1998); *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004). And in a Notice of Supplemental Authorities filed prior to Oral Argument, Defendant cites several additional cases that considered whether the comment "dead wood" constituted evidence of age-based animus. (ECF No. 88).

The Court has reviewed those cases and reiterates what it stated at Oral Argument: if the only evidence that Plaintiff had of alleged age-based discrimination was a couple of otherwise random comments about "dead wood," it is unlikely that the case would have made it this far as such comments — while perhaps improvident — would standing alone be too attenuated from Chreky's overall employment situation. But as set out below, those comments do not travel alone, and they are properly considered in the context of the entire record before the Court.

    ii.  *Second Method of Proving Pretext*

   "[T]he second way a plaintiff can establish pretext is to point to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Willis*, 808 F.3d at 645 (quotations omitted). Under *Willis*, there are three types of evidence that suggest "an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action": evidence that "(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably." *Id.*

   Plaintiff offers evidence that relates to the second and third categories of the *Willis* framework: evidence suggesting that younger physicians were treated more favorably by the Defendant and evidence of discrimination against others in the Plaintiff's protected class.

   Chreky argues that UPP's Physician Assistance Program ("PAP") is not applied evenly to younger and older physicians. PAP is "UPP's confidential rehabilitation pathway for physicians with behavioral concerns." (ECF No. 67, at 24). Plaintiff alleges that older physicians are let go after completing PAPs but that younger physicians are retained. He provides two comparator cases to illustrate this point. First, he says that Dr. S, age 43, used racially offensive terms in the workplace and went through PAP but was retained. (ECF No. 71, ¶ 76). In contrast, Plaintiff (71) and another older physician, Dr. C (67), were terminated after completing PAPs even though their behavior was allegedly less egregious than the behavior of Dr. S. (ECF No. 70, ¶¶ 75–81).

   In response to Defendant's argument that the PAP comparison between Dr. S, Dr. C, and Chreky was not apt, (ECF No. 74, at 14), Plaintiff states that the Defendant misinterprets the law concerning the use of comparators. (ECF 80, at 3). Plaintiff asserts that relevant factors *may*

include whether the comparators had the same supervisor, were subjected to the same standards, and engaged in similar conduct, but whether a comparator is appropriate is ultimately case-dependent. *Durst v. City of Phila.*, 798 Fed. App'x 710, 712 (3d Cir. 2020); *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003). In this instance, Plaintiff argues that the relevant factor is that all three were "certified as having completed the PAP program." (ECF No. 80, at 3).

Plaintiff also argues that another older physician, Dr. Kumar, was supposedly "pushed out" around the same time as Chreky. Dr. Kumar voluntarily retired in December 2020 after nearly 20 years at UPMC McKeesport, midway through her contract. Although her retirement was voluntary, Plaintiff argues that there were pressures on Dr. Kumar to leave. For instance, Plaintiff alleges that Dr. Kumar also received a "requires improvement" performance evaluation when UPP was trying to implement its plan to "remove dead wood." The Court does not place much weight on this argument, though — there is no evidence in the record, other than Plaintiff's conclusory claim, that Dr. Kumar was "pushed out" due to her age, or that anyone ever referred to her as "dead wood," or that that comment was made as to any other employee. If anything, the evidence on the record negates Plaintiff's argument about Dr. Kumar's departure from duty. (ECF No. 71, ¶ 138). So that argument is (charitably) a stretch and is not part of the Court's decisional calculus.

iii.    *Analysis of Aggregate Evidence*

The key inquiry is whether Chreky has "present[ed] evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005). Construing all the material facts in the light most favorable to Plaintiff as the nonmoving party and considering the record as a whole, the Court concludes that Plaintiff has shown that a reasonable jury *could* conclude that age-based animus had a "determinative influence" on Defendant's decision to not renew Plaintiff's contract.

A core part of Plaintiff's argument is that the die had been cast by November 19, 2020, when Dr. Wadas's sent his first email stating that Chreky would not be renewed. (ECF No. 70, ¶ 12). The Court agrees that a jury could so conclude. As such, the Court must look at what the world looked like *before* that date to determine whether a reasonable jury could find pretext for unlawful age discrimination.

The timeline recounted in Part I of this Opinion is instructive. By November 19, 2020, there were only a couple of things that could have caused UPP to decide not to renew Chreky's contract: the allegations that Chreky was leaving work early, the Soup Incident, broader complaints about Chreky's unavailability and unwillingness to see certain patients, and the confrontation between him and C.R. Chreky had not yet been put on a PAP, and neither the Wrong Medication Incident nor Worst Patient Chart Incidents had yet occurred.[9] The legitimate nondiscriminatory reason proffered by Defendant regarding Chreky's nonrenewal was that UPP leadership had lost confidence in him due to a repeated pattern of bad behavior and poor clinical conduct. But as of November 19, 2020, the incidents on which Defendant relies are sufficiently contested by Chreky to create jury questions as to whether they occurred at all and whether they actually motivated Defendant's employment decisions as to Plaintiff. The absence of an unchallenged record of misconduct may not show, definitively, that age-based animus was the force behind the nonrenewal decision, but it does, at least to a certain extent, "contradict[] the core facts put forward by the employer as the legitimate reason for its decision." *Kautz*, 412 F.3d at 467.

---

[9] The Court notes that even if the jury concluded that the die *was* cast on November 19, 2020, the incidents that occurred after that date may nonetheless come before the jury at trial under the after-acquired evidence doctrine. *See McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995); *Teamsters Loc. Union No. 355 v. Ensinger Penn Fibre, Inc.*, No. 24-1037, 2025 WL 1098840, at *3 (3d Cir. Apr. 14, 2025) ("The doctrine presumes the employee was terminated without just cause (otherwise it would not apply), and asks whether the unjustly terminated employee's later-discovered conduct was so wrongful that, had the employer known about it at the time of discharge, the employee would have been terminated anyway based on that wrongdoing.").

The comments made by Dr. Wadas in November and December 2020, given their temporal overlap with the conversations concerning Chreky's employment, also weigh against Defendant's position here. A reasonable jury may rationally ask why the record of Chreky's misconduct is so concentrated in late 2020. And while comments such as those concerning "dead wood" do not, on their own, constitute sufficient evidence to defeat summary judgment, *Dennison v. Indiana Univ. of Pennsylvania*, No. 22-2649, 2023 WL 8595426, at *3 (3d Cir. Dec. 12, 2023), there is much more on the record than simply those comments. Chreky also asserts that the "dead wood" comment is *indirect* evidence of age discrimination, not direct evidence. And while the heft of indirect evidence may turn out to be considerably less than that of direct evidence, such comments are nonetheless evidence properly considered in the mix. *Contra Glanzman*, 391 F.3d at 513.

Stepping back and looking at the overarching evidentiary record, although not compelled to do so, a rational jury could conclude that the workplace issues that had occurred by the time of Dr. Wadas's first email stating that Chreky's employment contract would not be renewed either did not occur or were overblown excuses to remove Dr. Chreky from the workforce, and that the incidents that occurred after that email played essentially no role in making that decision, since the nonrenewal decision had already been reached. And it was in that same timeframe that the considerably younger Dr. Kim toured the UPMC McKeesport ER. Coupled with that are comments by decisionmakers that, in the larger context, could be considered ageist and the reality that a jury could conclude that Defendant had the much younger Dr. Kim waiting in the wings to step into Chreky's role, even before Chreky was notified of his nonrenewal and before the PAP process was put in place to improve his performance. Put together, that jury could reasonably conclude that the reasons advanced by Defendant for Chreky's nonrenewal were a subterfuge for unlawful age discrimination.

But that same rational jury might well conclude that Defendant actually and legitimately decided that Dr. Chreky should no longer be treating patients in Defendant's ER because he left work shifts early, abandoned patients (including one having a heart attack) by leaving their care in the hands of non-physician ER staff, refused to see gynecology patients, was verbally abusive toward colleagues, on at least one occasion administered the exactly wrong medication to a cardiac patient, and did not competently document medical care in the charts of patients for whom he was responsible, and that the Defendant's decision-making about Dr. Chreky's employment had nothing to do with his age.

It is that dichotomy, generated by the record here, that sets this case up for trial, and for that reason, the Court is compelled to deny the Defendant's Motion for Summary Judgment. (ECF No. 63).

## IV.    Conclusion

For the reasons stated above, the Defendant's Motion for Summary Judgment (ECF No. 63) is DENIED. An appropriate Order will issue.

s/ Mark R. Hornak
Mark R. Hornak
United States District Judge

Dated: February 23, 2026